Henri and Mary TATRO, Individually, and as Next Friend of Amber Tatro, A Minor, Plaintiffs-Appellees, Cross-Appellants,

v.

The STATE OF TEXAS, et al., Defendants,

State Board of Education, Defendant-Appellant,

The Irving Independent School District, Defendant-Appellant Cross-Appellee.

No. 81-1454.

United States Court of Appeals, Fifth Circuit.

April 25, 1983.

Rehearing and Rehearing En Banc Denied July 5, 1983.

James W. Deatherage, Irving, Tex., for Irving.

Tally F. Parker, Jr., O. Glenn Weaver, Irving, Tex., amicus curiae for Irving, Texas Ass'n of School Boards, Ass'n of School Administrators.

Martha H. Allan, Asst. Atty. Gen., Richard L. Arnett, Texas Educ. Ass'n, Austin, Tex., for State Bd. of Educ.

James Todd, Austin, Tex., for plaintiffs-appellees, cross-appellants.

Before BROWN, GEE and JOLLY, Circuit Judges.

GEE, Circuit Judge:

This is Amber Tatro's second appearance before this court. The facts and procedural history of her case are reported in detail in our prior opinion, 625 F.2d 557 (1980) (*Tatro I*), and in those of the district court. 516 F.Supp. 968 (1981); 481 F.Supp. 1224 (1979). To aid the reader, we will briefly summarize them here. Amber is a seven year old girl afflicted with myelomeningocele, a birth defect commonly known as spina bifida. As a result of this handicap, she suffers from speech and orthopedic impediments and a neurogenic bladder. Because this last condition prevents voluntary emptying of the bladder, Amber must be catheterized several times daily to prevent injury to her health. The method chosen by Amber's doctors, the most widely accepted procedure, is Clean Intermittent Catheterization ("CIC").

In early 1979, when Amber was three and one-half years old, her mother asked the Irving Independent School District ("school district") to provide special education for Amber. The school district agreed, and in a series of meetings with the Tatros, developed an Individual Education Program ("IEP") for Amber as required by the Education of All Handicapped Children Act ("EAHCA"), 20 U.S.C. §§ 1401(19), 1414(a)(5) (1976). The IEP provided for Amber's placement in the school district's Early Childhood Development ("ECD") classes and for the provision of various other services to Amber, including physical and occupational therapy. The IEP did not provide for CIC and the school district maintained that it had no legal obligation to administer it.

Amber's parents next pursued an administrative appeal from the school district's decision not to provide CIC. *See* 20 U.S.C. § 1415 (1976) (setting out procedures). Pursuant to 20 U.S.C. § 1415(b)(2), an impartial hearing officer conducted a hearing and determined that the EAHCA required the school district to provide CIC. The Texas Commissioner of Education adopted the hearing officer's decision. *Amber T., bnf Mary T. v. Irving Independent School District,* TEA Docket No. 115–SE–579 (August 6, 1979). The Texas State Board of Education ("State Board") reversed the decisions of the Commissioner and hearing officer and reinstated the school board's decision not to .provide CIC. After thus exhausting state remedies as required by the EAHCA, the Tatros brought the present action in federal district court pursuant to 20 U.S.C. § 1415(e)(2) (1976), naming the school board, the State Board, and others as defendants.[1]

The Tatros contended that the school district violated the EAHCA by failing to provide Amber with a "free appropriate public education," *id.* § 1412(1), which is defined in part as "special education and related services." *Id.* § 1401(18). Specifically, they argued that CIC is a "related service" the state must provide to fulfill its duty to Amber under the EAHCA. The Tatros also argued that the school district's refusal to provide CIC violated section 504 of the Rehabilitation Act of 1973 which prohibits discrimination against the handicapped in federally funded programs. 29 U.S.C. § 794 (Supp. V 1981).

---

1. All defendants save the school board and the State Board were dismissed by the district court, 516 F.Supp. at 972–73; the Tatros do not contest these dismissals. The propriety of the State Board's action is discussed in Part III, *infra.*

The district court denied the Tatros' motion for a preliminary injunction to require the school board to provide CIC. 481 F.Supp. at 1229. That court concluded that CIC is not a "related service" within the meaning of the EAHCA because the need for it does not arise from the effort to educate. *Id.* at 1227. The district court further concluded that section 504's prohibition of discrimination does not impose a duty upon the school board to take affirmative action such as the provision of CIC. *Id.* at 1228–29.

The Tatros appealed from the district court's order, and based upon facts that were assumed for purposes of the appeal, this court reversed. *Tatro I,* 625 F.2d at 558 n. 1, 562. This court held that CIC falls within the literal terms of the statutory definition of "related services," which includes "supportive services . . . as may be required to assist a handicapped child to benefit from special education." *Id.* at 564 (citing 20 U.S.C. § 1401(17) (1976)). Because, under the assumed facts, Amber would be unable to attend ECD classes without provision of CIC during the school day, this court concluded that CIC was essential if she was to benefit from special education, and that CIC was therefore a "related service" in her case. The district court had thought it necessary to limit the statutory language to services arising from the effort to educate in the absence of any evidence of Congressional intent to require provision of life support services through an education statute. 481 F.Supp. at 1227. This court concluded that the district court's limiting construction of the EAHCA's literal language was erroneous because the EAHCA contained its own limitations on the types of life support services falling within the ambit of "related services." 625 F.2d at 562. This court further held that the school district's refusal to provide CIC violated section 504.

**2.** The school district argues that after *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), federal statutes that grant funds to state programs cannot be read to confer judicially enforceable substantive rights on the programs' beneficiaries. This argument misreads *Pennhurst,* which only requires that funding

## I. The EAHCA Claim

■ Were we writing on a clean slate, we would share the district court's reluctance to read a statute designed to aid education to require provision of medical necessities of life which are required by a child whether or not she participates in the state's educational program. Nevertheless, *Tatro I* is the authoritative interpretation of the EAHCA in this circuit, and under "law of the case" principles, must be followed by us in this subsequent appeal "unless (1) the evidence on a subsequent trial was substantially different, (2) controlling authority has since made a contrary decision of the law applicable to such issues, or (3) the decision was clearly erroneous and would work a manifest injustice." *White v. Murtha,* 377 F.2d 428, 432 (5th Cir.1967) (footnote omitted; enumeration added); *see Goodpasture, Inc. v. M/V Pollux,* 688 F.2d 1003, 1005–06 (5th Cir.1982); *United States v. McClain,* 593 F.2d 658, 664 (5th Cir.), *cert. denied* 444 U.S. 918, 100 S.Ct. 234, 62 L.Ed.2d 173 (1979). None of these considerations justifies departure from *Tatro I* by this panel.

Although we perhaps would have taken a different view of the EAHCA upon de novo consideration, we cannot say that the well-documented *Tatro I* decision was not also a principled interpretation of that undeniably delphic statute. It is not clearly erroneous and certainly does not work manifest injustice. Further, neither the parties' briefs nor our own research has revealed any supervening authority.[2] Thus, the only remaining issue under the EAHCA in this case is whether the evidence adduced on remand from *Tatro I* is so different from the assumed factual basis for that decision that its legal conclusions no longer apply. The school district argues that such is the case.

statutes must by their terms create such rights. That the EAHCA creates enforceable rights to "special education and related services" was clearly established in *Board of Education v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 3048–49, 73 L.Ed.2d 690 (1982). The issue in the present case is the scope of those rights.

*Tatro I* did not hold that all life support services are "related services" under the EAHCA, nor that school districts must always provide CIC to children who need it. Derived from the statute and its regulations were three conditions that must obtain before a school board must provide services such as CIC:

First in order to be entitled to any related services at all, a child must be handicapped so as to require special education. 45 C.F.R. § 121a.14 (1979) (comment one); *see* 20 U.S.C.A. § 1401(1).... Second, the life support service must be necessary to aid a handicapped child to benefit from the special education to be provided. *See id.* § 1401(17). Thus, a life support service would not be a related service if it did not have to be provided during school hours, but instead could be performed at some other time. Third, in order to be a related service, the life support service must be one which a nurse or other qualified person can perform. 45 C.F.R. § 121a.13(b)(10) (1979). Excluded from the term "related services" are those health-related activities which must be performed by a licensed physician that are not provided "to determine a child's medically related handicapping condition which results in the child's need for special education and related services." *Id.* § 121a.13(4). Thus, even under a literal interpretation of the statutory definition, the types of life support services needed by a child which can be related services are limited.

625 F.2d at 562–63 (footnotes omitted).

All parties agree that Amber is handicapped and in need of special education. The school district argues that the district court erred in finding the other two *Tatro I* conditions met in this case. It is argued first that under Texas law, CIC may not be performed by a nurse or other qualified person unless a physician is physically present to control and supervise the procedure. The argument concludes that such

participation by a physician transforms CIC into "medical treatment" which the school district need not provide under *Tatro I. Id.* at 563; 20 U.S.C. § 1401(17) (1976) (medical treatment is a related service only if provided for diagnostic and evaluation purposes). The district court, guided by its extensive experience in applying Texas law, and with the aid of able amicus curiae,[3] rejected the school district's view of state law. 516 F.Supp. at 975–76. We cannot say that the district court was wrong.

■ As the district court found, it has been long settled that physicians in Texas may prescribe treatment and delegate its administration to others. *Thompson v. Texas State Board of Medical Examiners,* 570 S.W.2d 123, 129–30 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.); *McKinney v. Tromly,* 386 S.W.2d 564 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r.e.); *see also* Op.Tex. Atty.Gen. No. WW–1403 (1962). Subsequent to the district court's decision on remand, this principle was codified in Texas' new Medical Practice Act:

a person licensed to practice medicine shall have the authority to delegate to any qualified and properly trained person or persons acting under the physician's supervision any medical act which a reasonable and prudent physician would find is within the scope of sound medical judgment to delegate if, in the opinion of the delegating physician, the act can be properly and safely performed by the person to whom the medical act is delegated and the act is performed in its customary manner, not in violation of any other statute, and the person does not hold himself out to the public as being authorized to practice medicine. The delegating physician shall remain responsible for the medical acts of the person performing the delegated medical acts.

Tex.Rev.Civ.Stat.Ann. art. 4495b § 3.06(d) (1) (Vernon Supp.1982–1983). The Texas Nursing Practice Act defines administration of treatments prescribed by a li-

---

**3.** The joint brief of the Texas Medical Association and the Dallas County Medical Society as amicus curiae is reprinted as an appendix to the district court's opinion on remand. 516 F.Supp. at 987.

censed physician as a "professional nursing act" and hence not unlawful practice of medicine. *Id.,* art. 4518 § 5. However, consistent with the district court's finding, 516 F.Supp. at 976, the new Medical Practice Act also allows delegation to any qualified person, not only to nurses. The Medical Practice Act goes on to clarify the legal status of a physician's delegatee:

A person to whom a physician has delegated a medical act to perform is not guilty of practicing medicine without a license unless the person acts with knowledge that the delegation and action thereunder · is a violation of this Act.

Tex.Rev.Civ.Stat.Ann. art. 4495b § 3.07(i) (Vernon Supp.1982–1983).

The Medical Practice Act's requirement that a physician supervise those to whom he delegates a medical act has appeared in a number of prior statutes, and has been construed by the Texas Attorney General "not [to] require the constant physical presence of a physician to authorize the performance of professional nursing acts by one not oth-

erwise licensed to perform them, so long as the responsible physician personally assumes control and supervision of the employee or instructs him in what is to be done, and remains reasonably available to see that the nursing acts are properly performed." Op.Tex.Atty.Gen. No. H–395 (Sept. 9, 1974). *See also* Op.Tex.Atty.Gen. No. H–1295 (Dec. 19, 1978) (nurses may administer treatment without direct supervision by doctor); Op.Tex.Atty.Gen. No. H–368 (Aug. 12, 1974) (physical therapy may be administered pursuant to doctor's directions without any requirement of constant physical presence of doctor); Op.Tex. Atty.Gen. No. H–27 (Apr. 12, 1973) (ambulance attendants not in physical presence of doctor may provide emergency care if in telephone communication with him).[4]

■ We think the prescription and instructions for CIC that the district court required the Tatros to provide to the school district fulfill the requirements of Texas law and allow school district employees legally to administer ·CIC to Amber.[5] We

---

**4.** These interpretations remain good law under the Medical Practice Act:

No substantive changes in prior law or interpretation of prior law have been intended unless expressly done so in this Act. Consistent with this intention, unless expressly provided otherwise in this Act, any previous judicial opinion, attorney general's opinion, board practice, or interpretation is not to be considered modified or declared inapplicable.

Medical Practice Act of 1981, 67th Leg., 1st C.S., ch. 1, § 6(c).

**5.** The school district also was provided with the Tatros' written consent to its provision of CIC to Amber. Amber's doctor's prescription was in letter form as follows:

Mr. John Townley
Irving Independent School District
901 O'Connor Rd.
Irving, Texas

      Re: C.I.C. instructions for
      Amber Tatro—Prescription

Dear Sir:

Amber Tatro has been placed on a schedule of Clean Intermittent Catheterization every three to four hours during the waking day. Amber is to be catheterized at the times listed:

| | |
|---|---|
| 6:30 A.M. | 3:30 P.M. |
| 9:30 A.M. | 6:30 P.M. |
| 12:30 P.M. | 9:30 P.M. |

If Amber's diaper is wet at the time for the scheduled catheterization, this should be re-

ported to me or Dr. George Hurt at the Spina Bifida Clinic at The Scottish Rite Hospital as the above schedule may need to be modified.

A qualified school nurse or other qualified person can perform C.I.C. and attached to these instructions are the Scottish Rite Hospital instructions for catheterization of a *female* which are to be followed.

A # 10 or # 12 catheter should be used to start out.

The above schedule for catheterization and size of catheter may be altered upon the direction of myself or Dr. Hurt from time to time according to Amber's needs.

If there are any questions, I or Dr. Hurt may be reached through the Spina Bifida Clinic at Scottish Rite Hospital.

[The doctor's signature, as experience has taught us to expect, was illegible. The record reveals that Dr. Goldstein signed.]

---

Name
3/17/81
Date

Attached to the prescription were detailed instructions for administration of CIC:

TEXAS SCOTTISH RITE HOSPITAL FOR CRIPPLED CHILDREN INSTRUCTIONS FOR PARENTS ON CATHETERIZATION OF FEMALE

have fully reproduced these documents in the margin to emphasize that a school district is entitled to require a detailed prescription and instructions tailored to the particular needs of each individual child for whom it is asked to provide health-related services under the EAHCA. It should not be required to exercise medical discretion. The prescription should make clear, as Amber's does, that the child is under the continuing care of the prescribing physician who will monitor the child's continuing need for the services and modify the prescription accordingly. Further, the prescription should identify the circumstances in which the school district personnel should seek further guidance from the physician. Since in this case the school district has been provided these assurances, we conclude that the requirement of *Tatro I* that CIC be a service that a nurse or other qualified person can perform is satisfied.

The school district's second argument is that CIC is not a related service in Amber's case because it is not "required to assist [her] to benefit from special education." 20 U.S.C. § 1401(17) (1976); *Tatro I,* 625 F.2d at 563. The school district does not contest the district court's finding, consistent with the facts assumed in *Tatro I,* that CIC is required for Amber to attend the school district's half-day ECD classes. 516

F.Supp. at 977. Rather, it contends for the first time in its reply brief in this appeal that the ECD classes themselves are not necessary for Amber to benefit from special education.

The EAHCA defines "special education" as "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16) (1976). The school district contends that before Amber is entitled to CIC, she must allege and prove that she could not benefit from special education provided to her by the school district at home or in another institution where CIC is already being provided. If she could benefit from special education in these alternative placements, the argument goes, provision of CIC by the school district would not be required to fulfill the requirements of the EAHCA. We cannot agree that the Tatros must make such a showing in this case.

In its first case considering the EAHCA, the Supreme Court recently held that the statute provides a "basic floor of opportunity" consisting of personalized instruction and related services designed to enable handicapped children to benefit from educa-

---

*Purpose:*
To completely empty the bladder at scheduled intervals in order to decrease the incidence of urinary tract infection.
Urine that stays stagnant in the bladder is more likely to become infected. A bladder that stays full becomes enlarged and thickened.
Scheduled emptying of the bladder allows the patient to become familiar with the difference in the sensation of a full bladder and an empty bladder.
*Equipment Needed:*
Clean catheter, metal or rubber. (Metal is best since it can be boiled repeatedly without deterioration.)
Soap and water.
Dish to catch the urine, for example, a re-usable jar.
Large underpad, to prevent soaking bed linens.
*General Instructions:*
1. Wash hands with soap and water.
2. Get all of the equipment ready.
3. Get child ready. (If possible, put at table height since it is easier to do this procedure at this height.) Place child on her back.

4. Spread labia apart with one hand and wash genitalia with soap and water with the other hand, *always* moving in a downward direction. (*Never* wash in an upward direction since this will move germs from around the rectum up into the area of the bladder opening.)
5. Insert catheter in urethra and let *all* urine drain out of the bladder. This may take longer than you think, so do not remove catheter until the urine has stopped draining.
6. If you are unable to catheterize, contact your local Public Health Nurse or call Texas Scottish Rite Hospital.
7. Discard urine.
8. Clean catheter. Clean with soap and warm water after each use. Allow to dry and place in a clean, dry envelope.
At least once a day after the catheter has been washed with soap and water, place it in a pot of water and boil for 20 minutes. Allow the catheter to air dry and place it in a clean dry envelope.

tion. *Board of Education v. Rowley,* —— U.S. ——, ——, 102 S.Ct. 3034, 3048, 73 L.Ed.2d 690 (1982). Although the state is accorded wide discretion to choose educational means, *id.* 102 S.Ct. at 3051–52, and need not maximize each child's potential, *id.* 102 S.Ct. at 3048, the required instruction and related services must meet certain standards. "Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and *must comport with the child's IEP.*" *Id.* 102 S.Ct. at 3049 (emphasis added). Similarly, the regulations under the EAHCA require that each handicapped child's placement be based upon his or her IEP. 34 C.F.R. § 300.-552(a)(2) & (b) (1982).

The EAHCA provides that each handicapped child's IEP will be jointly developed by the school officials, the child's teacher, his or her parents and, when appropriate, the child. 20 U.S.C. § 1401(19) (1976). The IEP is the educational blueprint that specifies how the child is to be taught, sets goals and determines how progress is to be measured. *Id.; see Helms v. McDaniel,* 657 F.2d 800, 802 (5th Cir.1981), *cert. denied* 455 U.S. 946, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). As such, the IEP is the primary vehicle for implementing the requirements of the EAHCA. In requiring that special education and related services be provided in conformity with a child's IEP, the Supreme Court recognized the central role played by the IEP in a statutory scheme like the EAHCA, which has placed primary responsibility for formulating handicapped children's education in the hands of state and

local school agencies in cooperation with each child's parents. *Rowley,* 102 S.Ct. at 1051–52; *McDaniel,* 657 F.2d at 802.

Amber's IEP explicitly calls for her placement in the school district's ECD classes. *See* Plaintiffs' Proposed Stipulation of Facts, exhibit A. The IEP states that its justification for characterizing this setting as the most appropriate as well as the least restrictive is that "[t]esting indicates the need for [Early Childhood] placement." *Id.* Moreover, the "instructional/learning strategies" established by Amber's IEP include provision for a "structured atmosphere," immediate feedback and "small group instruction," *id.,* all of which are consistent with ECD placement.

■ We are convinced that the central role of the IEP in the educational scheme contemplated by the EAHCA and in the standard of review developed in *Rowley* gives rise to a presumption in favor of the educational placement established by Amber's IEP. Moreover, because the IEP is jointly developed by the school district and the parents, fairness requires that the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate. Since the school district has not even attempted to do so, its argument must be rejected and we need not reach the thorny issue of what circumstances might call for judicial modification of an IEP. *See Rowley,* 102 S.Ct. at 3051 (setting out general standard of review).[6] In Amber's case, by virtue of the provisions of her IEP, the "special education" required by the EAHCA consists of her participation in the school district's ECD classes.[7] Since the district

---

6. We do not place an undue burden on the school district; the IEP is not etched in stone. The EAHCA and its attendant regulations provide for periodic review and modification of IEP's by school authorities and parents. 20 U.S.C. §§ 1412(4), 1414(a)(5) (1976); 34 C.F.R. § 300.343(d) (1982).

7. The school district also asserted in its reply brief that ECD classes are for handicapped students only. The court in *Tatro I* apparently assumed that ECD classes also included non-handicapped children because it rested its decision in part upon its conviction that Amber's

exclusion from ECD classes would violate the "mainstreaming" mandate of the EAHCA. 625 F.2d at 563. The statute requires that "to the maximum extent appropriate," handicapped children will be educated with non-handicapped children, and that removal of handicapped children from regular classes will occur only when their handicaps cannot be accommodated by "supplementary aids and services." 20 U.S.C. § 1412(5) (1976); *Rowley,* 102 S.Ct. at 3049. The record does not clearly establish whether, in fact, the school district's ECD

court found as a fact that provision of CIC during the school day is necessary for Amber to attend ECD classes, and since that finding has not been shown to be clearly erroneous, CIC is therefore "required to assist a handicapped child to benefit from special education" and is a "related service" under the EAHCA. 20 U.S.C. § 1401(17) (1976); *Tatro I,* 625 F.2d at 563. The school district must provide it to Amber Tatro.

## II. The Section 504 Claim and Attorneys' Fees

■ The EAHCA does not provide for attorneys' fees awards. The district court awarded attorneys' fees to the Tatros under section 505 of the Rehabilitation Act of 1973, *as amended,* 29 U.S.C. § 794a(b) (Supp.V 1981), which authorizes such awards to prevailing parties in actions to enforce provisions of the Rehabilitation Act. 29 U.S.C. § 701 *et seq.* (1976). *Tatro I* had held that section 504 of that Act imposed an obligation on the school district to provide CIC to Amber. 625 F.2d at 564–65. The school district now argues that the Supreme Court's subsequent decision in *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) precludes a finding that section 504 imposed such affirmative duties on state agencies, and that therefore, no Rehabilitation Act violation has been established to support an attorneys' fees award.[8]

In *Pennhurst,* the Supreme Court was asked to decide whether section 6010 of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010, conferred enforceable substantive rights on the beneficiaries of the Act. In deciding that it did not, the Court referred to *Southeastern*

classes are for handicapped students only. However, even if the classes are only for the handicapped, so that the EAHCA's mainstreaming provisions do not require that Amber attend them, we have seen that her IEP *does* require ECD class attendance. Therefore, under the statute and *Rowley,* so does the EAHCA.

8. As the district court correctly observed, the question whether Section 504 imposes affirmative obligations on the states is logically antecedent to the question of whether such obliga-

*Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), its only major case involving section 504, as illustrating the failure of the lower court

to recognize the well-settled distinction between Congressional "encouragement" of state programs and the imposition of binding obligations on the States.... Relying on that distinction, this Court in *Southeastern Community College v. Davis,* 442 U.S. 397, 60 L.Ed.2d 980, 99 S.Ct. 2361 (1979), rejected a claim that § 504 of the Rehabilitation Act of 1973, which bars discrimination against handicapped persons in federally funded programs, obligates schools to take affirmative steps to eliminate problems raised by an applicant's hearing disability. Finding that "state agencies such as Southeastern are only 'encourage[d]' ... to adopt and implement such policies and procedures," *Id.,* at 410, 60 L.Ed.2d 980, 99 S.Ct. 2361 [2369] (quoting the Act), we stressed [that] "Congress understood [that] accommodation of the needs of handicapped individuals may require affirmative action and knew how to provide for it in those instances where it wished to do so." *Id.,* at 411, 60 L.Ed.2d 980, 99 S.Ct. 2361 [2369].

451 U.S. at 27, 101 S.Ct. at 1544–45, 67 L.Ed.2d at 713 (citation omitted).

Although *Pennhurst* reinforced the district court's doubts that section 504 requires provision of CIC, the court concluded that the Supreme Court had not spoken with sufficient clarity to allow it to depart from prior decisions of this court squarely on point. 516 F.Supp. at 985. As a single panel of the court, we find ourselves simi-

tions are enforceable by an implied right of action. 516 F.Supp. at 984. If such obligations exist after *Pennhurst,* there is a private right of action to enforce them in this circuit. *Helms v. McDaniel,* 657 F.2d 800, 806 n. 10 (5th Cir. 1981) *cert. denied* 455 U.S. 946, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982); *Baker v. Bell,* 630 F.2d 1046, 1055 (5th Cir.1980); *Tatro I, supra* (implicit); *see also Camenisch v. University of Texas,* 616 F.2d 127 (5th Cir.1980), *vacated as moot,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

larly constrained. *Tatro I,* binding upon us to the extent that it is law of the case, clearly held that CIC is within section 504's nondiscrimination mandate. 625 F.2d at 564. Moreover, two other panels of our court have held that states must take some affirmative action to provide "services and accommodations" under section 504, notwithstanding the *Davis* decision. *Majors v. Housing Authority,* 652 F.2d 454, 457 (5th Cir.1981); *Camenisch v. University of Texas,* 616 F.2d 127 (5th Cir.1980). Although *Camenisch,* relied upon in *Tatro I,* was vacated as moot without reaching the merits of the section 504 issue, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175, *Majors* remains good law in our circuit. A recent decision of a sister circuit has reached the same result. *New Mexico Ass'n for Retarded Citizens v. New Mexico,* 678 F.2d 847 (10th Cir.1982).

As we have seen, a prior decision does not bind us as law of the case if it is supervened by controlling authority. *White v. Murtha, supra.* Similarly, the general rule that one panel of our court does not overrule another panel does not prevent us from overriding a prior decision "based entirely on [a] theory" subsequently rejected by the Supreme Court. *Hanson v. Town of Flower Mound,* 679 F.2d 497, 501 (5th Cir.1982). We do not think *Pennhurst* goes so far. In *Majors,* this court recognized that *Davis* generally disapproved of affirmative action requirements under section 504. 652 F.2d at 456. However, the court went on to emphasize the following *caveat* from *Davis:*

> We do not suggest that the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons always will be clear. It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some

useful employment. Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a State. Thus, situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory. Identification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be an important responsibility of HEW.

*Davis,* 442 U.S. at 412–13, 99 S.Ct. at 2370; *Majors,* 652 F.2d at 456. This court concluded, as had the panels in *Camenisch* and *Tatro I,* that where a plaintiff, unlike the plaintiff in *Davis,* could receive the full benefits of a state program if reasonable accommodations were provided, refusal to provide them would constitute discrimination and would not fall within the *Davis* affirmative action exception. *Majors,* 652 F.2d at 457–58; *Tatro I,* 625 F.2d at 564; *Camenisch,* 616 F.2d at 132–33; *accord, New Mexico Ass'n for Retarded Citizens, supra.*

Although *Pennhurst* undoubtedly emphasized the component of the *Davis* decision that disapproved judicial recognition of affirmative obligations under section 504, it did not overrule the portion of *Davis* relied upon in our earlier decisions. *Pennhurst* therefore forms an insufficient basis upon which to justify a departure from prior law by this panel.

▮ The school board's additional objections to its liability under section 504 are groundless and merit little discussion. The district court found that given our prior decision that refusal to provide CIC is discriminatory under section 504, Amber had been thereby excluded from a "program of activity receiving federal financial assistance." 29 U.S.C. § 794 (Supp.V 1981); 516 F.Supp. at 977 n. 17. That finding, necessary to establish a cause of action under section 504, is amply supported by the record.[9] The school board's other suggested errors are likewise refuted by the record.

---

**9.** *See Tatro v. Texas,* No. CA–3–79–1281–G

(N.D.Tex. Sept. 8, 1981) (unpublished memo-

### III. The State Board

The district court enjoined the school board and the State Board to "modify the Individual Education Program of Amber Tatro to include the provision" of CIC. Upon the motion of the school district, the court's original judgment was amended to hold the State Board jointly and severally liable with the school board for attorneys' fees. The State Board argues that it should not have been included in the injunction and that it is not liable for attorneys' fees.

The EAHCA places primary responsibility for development and revision of IEP's upon local school boards. 20 U.S.C. § 1414(a)(5) (1976). The state educational agency, here the State Board, is given supervisory responsibility to assure that local agencies carry out their responsibilities. 20 U.S.C. § 1412(6) (1976). The State Board argues that the district court erred in ordering it to modify Amber's IEP because the EAHCA places that duty on the local school board. The State Board's argument is based on an unduly scholastic reading of the district court's judgment. Although the words of the judgment standing alone perhaps suggest that the State Board should itself engage in the revision of Amber's IEP, the district court's opinion makes clear that the State Board has only been enjoined to act in the supervisory capacity required of it by the EAHCA. 516 F.Supp. at 972 ("Because the State Board of Education has supervisory responsibilities for assuring that Amber is educated in accordance with the EAHCA ... the members ... will be retained in their official capacities for the purpose of injunctive relief."). See Kruelle v. New Castle County School District, 642 F.2d 687, 697 (3d Cir.1981) (interpreting district court's order to state agency to require only the supervisory action contemplated by

the EAHCA); see also S–1 v. Turlington, 635 F.2d 342 (5th Cir.), cert. denied 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981). The State Board need only "assure" that Amber's IEP conforms to the EAHCA as interpreted by this court. 20 U.S.C. § 1412(6) (1976). Given the State Board's prior action preventing administration of CIC in Amber's case, it was within the district court's discretion to enjoin the State Board to fulfill its statutory duty in order to insure complete prospective relief to the plaintiffs.

The State Board's second argument is that even if it was properly enjoined under the EAHCA, the district court did not make a specific finding that it had violated section 504 and that it was therefore improper for the district court to hold it liable for attorneys' fees under the Rehabilitation Act. We have held already that under *Tatro I* the district court properly held that by refusing to provide CIC, the school board denied Amber the benefits of a federally assisted program or activity in violation of section 504. The record established that after the school board's decision not to provide CIC was reversed by an independent hearing officer and the state Commissioner of Education, the State Board acted to reinstate the school board's original decision. See Plaintiffs' Exhibit 5a and attachments (Order of the State Board of Education, Sept. 8, 1979). That action, which the State Board does not deny that it took, had the effect of denying the benefits of a federally funded program to Amber Tatro just as the school board's action had. For the same reasons, the State Board's action violated section 504 and supported an award of attorneys' fees under section 505.[10]

---

randum opinion) in which after entry of the judgment below, the district court afforded the school board an opportunity to reopen the record to rebut the school superintendent's concession that the school district received federal assistance for programs from which Amber had been excluded. The record reveals no attempt by the school district to do so.

**10.** The district court found that an attorneys' fees award against the State Board was not barred by the Eleventh Amendment. *Tatro v. Texas,* No. CA–3–79–1281–G (N.D.Tex. Sept. 8, 1981) (unpublished memorandum opinion). The State Board has not appealed that decision; however it has suggested that its action reversing the decisions of the hearing officer and Commissioner of Education was taken in its judicial capacity and is entitled to immunity on

For the reasons we have stated, the judgment of the district court is in all respects AFFIRMED.

that basis. We need not decide whether judicial immunity might bar attorneys' fees awards under § 505, *see Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), because this court has held that the EAHCA denies to state educational agencies the judicial power to review the decisions of an independent hearing officer. *Helms v. McDaniel,* 657 F.2d 800, 805–06 & n. 9 (5th Cir.1981), *cert. denied* 455 U.S. 946, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). Lacking judicial capacity, the State Board had no judicial immunity.