**David L. SWIFT II, By and Through his Father, David L. SWIFT**

v.

**The RAPIDES PARISH PUBLIC SCHOOL SYSTEM and Allen Nichols, in his Official Capacity as Superintendent of the Rapides Parish Public School System.**

Civ. A. No. 91–0789.

United States District Court,
W.D. Louisiana,
Alexandria Division.

Feb. 11, 1993.

Thomas E. Bellanger, Adv. Cnt. for Elderly & Disabled, Lafayette, LA, for plaintiff.

Robert L. Hammonds, Hammonds & Sills, Baton Rouge, LA, for defendants.

## REASONS FOR JUDGMENT

LITTLE, District Judge.

Plaintiff David L. Swift II ("David"), through his father, David L. Swift, brings this suit against the Rapides Parish Public School System and Allen Nichols in his capacity as superintendent, seeking declaratory and injunctive relief ordering defendants to remove David from his current placement in a self-contained classroom on a regular public school campus and place him in a residential educational facility. The plaintiff alleges that by denying David placement in a residential facility, the defendants have violated (1) the Louisiana Education of Exceptional Children Act, La.Rev.Stat.Ann. §§ 17:1941–17:1959 (West 1982 & Supp.1992); (2) the Individuals With Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1401–1485; (3) section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and (4) the Civil Rights Act, 42 U.S.C. § 1983.[1]

The Swifts bring this action pursuant to 20 U.S.C. § 1415(e)(2), which gives the right to bring a civil action in a United States District Court to any party aggrieved by a state educational agency's decision regarding the educational placement of a child with disabilities. We have reviewed the records of the administrative proceedings, as well as certain post-hearing expert evaluation reports and affidavits, which were submitted by the parties in support of their respective memoranda regarding plaintiff's motion for a preliminary injunction. In pretrial stipulations, both parties stated that they did not intend to introduce any documentary or testamentary evidence in addition to that in the record. Each party stipulated that all witnesses, if called at trial, would testify in accord with statements contained in their affidavits submitted in conjunction with plaintiff's motion for preliminary injunction. Accordingly, we informed both parties at the pretrial conference held on 21 December 1992 that rather than decide the preliminary injunction motion and then set a trial date some months in the future, we would decide this matter on the record. That decision was met with approval by all concerned. After careful review of the evidence, we are convinced that David is receiving a "free appropriate public education" in his current placement.

## I.  BACKGROUND

David, who is twelve years old, has been classified by the defendants as Behavior Disordered/Emotionally Disturbed ("BD/ED").[2] He is of average intelligence, although his "performance scores" on I.Q. tests are in the low to average range. This has been attributed partly to a deficiency in his ability to perform "fine motor skills" (such as handwriting) and partly to his attention deficit disorder with hyperactivity (he is unable to sit and focus on the task at hand). David lives with his adoptive parents, Katie and David Swift, who are also his biological grandparents. Mrs. Swift is a retired nurse and is permanently disabled due to a work-related injury. Mr. Swift is retired from the military.

In 1984, when David was four years old, his adoptive mother referred him to the School Board for his first evaluation. The tests revealed that David's personal and social skills were inappropriate for his age. He was classified as non-categorical preschool handicapped and placed in a class for such students at the School Board's Intervention Center. David was scheduled for an evaluation by a psychiatrist, who diagnosed David as having an attention deficit disorder with hyperactivity and recommended placement in a BD/ED class. The school board then placed David in a preschool BD/ED class at Horseshoe Elementary School, where he remained for the 1985–86 school year.

In the fall of 1986, David was enrolled in a BD/ED class at Pineville Elementary School. A placement committee[3] meeting was held to develop David's individualized

---

**1.** We do not address the plaintiff's claims under section 504 of the Rehabilitation Act and under 42 U.S.C. § 1983, because the plaintiff failed to make any arguments in prosecution of these claims. We note, however, that relief under section 504 is not available for EAHCA (now IDEA) violations, and section 1983 requires intentional discrimination, which the plaintiff has not alleged. *See Scokin v. Texas,* 723 F.2d 432, 441 (5th Cir.1984).

**2.** The term "behavior disordered" is defined by state regulations as a pattern of "situationally inappropriate interpersonal behavior" that cannot be explained by intellectual, sensory, neurological, or general health factors. La. Dept. of Educ. Bulletin 1706 § 916. The term "emotion-

ally disturbed" is defined as a serious pattern of behavior so severe that it requires special education services for the full school day or longer as well as individual therapy, counseling, or related services. La. Dept. of Educ. Bulletin 1706 § 927.

**3.** The Individuals with Disabilities Education Act (IDEA) requires that an individualized education program ("IEP") be developed for each child with a disability. The IEP must be developed at a meeting of the child's parents, teacher, the child (when appropriate), and a representative of the local or intermediate education agency who is qualified to provide or supervise the instruction of children with disabilities. 20 U.S.C. § 1401(a)(20) (Supp.1992).

education program ("IEP").[4] It was determined that David would continue placement in the self-contained BD/ED classroom at Pineville Elementary, receive counselling as needed, receive occupational therapy, and be evaluated by an adaptive physical education teacher. David was to participate in lunch, recess, and physical education with children without disabilities. Another IEP meeting was held in January 1988, and David's parents requested that an independent evaluation be performed on David. The School Board scheduled an evaluation with LSU Medical Center in Shreveport, Louisiana in February 1988. The LSU appraisal team recommended continuing David's classification as BD/ED, continuing the occupational therapy services, developing a comprehensive behavior management program, and possible placement in an adaptive physical education class. In March 1989, the IEP committee met and decided to maintain David's IEP, except that a teacher's aide would be assigned to David's classroom and David would participate in an adaptive physical education program. It appears that David's parents attended all of these IEP meetings and signed the IEP's, indicating their agreement with David's placement.

## II. THE APPROPRIATE PLACEMENT DISPUTE

The dispute over appropriate placement for David began to take root in late 1989. In September 1989, after receiving notice that David would be assigned to a self-contained classroom at L.S. Rugg Elementary School rather than at Pineville Elementary, David's parents requested that an additional IEP meeting be held. When the IEP committee met in October 1989, David's parents complained that the teacher at L.S. Rugg was not certified in special education, that the classroom lacked a personal computer for exclusive individualized instruction with David, and that a new IEP

had not been developed for the 1989–90 school year. The School Board explained that the teacher had been assigned on an emergency/temporary basis; that an experienced BD/ED teacher's aide had been assigned to work with the teacher; that the classroom contained a sufficient number of computers to serve David and the six other students; and that a new IEP was not necessary because David merely had been assigned to an age-appropriate classroom, not a new classification.

At the October 1989 meeting, David's parents presented the School Board with documents from a psychiatrist at Briarwood Psychiatric Hospital, where the Swifts had placed David for medical reasons from 2 November 1988 through 23 December 1988. The psychiatrist had recommended placement in a residential facility because David's medical condition needed long-term intensive inpatient care. All members of the IEP committee except David's parents disagreed that David required educational placement in a residential facility. Additional IEP meetings were held on 26 October 1989, 12 December 1989, and 18 December 1989, at which the Swifts continued to request placement in a residential facility. At each, all other members of the committee maintained that residential placement was not necessary in David's case.

During the fall of 1989, David's parents unilaterally obtained private evaluations by two child psychiatrists and other professionals. Child psychiatrist Michael Parker, M.D. stated that David could not be treated successfully as an outpatient at an acute-care hospital and that residential placement was therefore necessary. Child psychiatrist Hugh King, M.D. stated that for David to maintain an academic level commensurate with his age, it was necessary that he live somewhere other than his home. He suggested that residential placement would give David the individualized

---

4. The IEP is "the primary vehicle for implementing the requirements of the EAHCA [now IDEA]." *Tatro v. Texas*, 703 F.2d 823, 830 (5th Cir.1983), *aff'd*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984). It is a written statement of educational objectives that is developed for each child with a disability. It includes among other things: (1) present levels of performance; (2) annual goals; (3) related services to be provided; and (4) the extent to which the child will participate in regular programs.

instruction he needs to achieve his ability. Jimmie Womack, a clinical social worker, stated that residential placement was necessary for David to achieve the best of his ability. He noted that David's parents were having great difficulty with him at home and that residential placement would give the parents some relief from the demands placed on them by this "difficult child."

In the spring of 1990, David's parents filed a complaint with the United States Department of Education, Office of Civil Rights ("OCR"), alleging that by refusing to place David in a residential facility, the School Board had denied David a free appropriate public education in violation of Section 504 of the Rehabilitation Act of 1973. In April 1990, after conducting an investigation, OCR concluded that the School Board was providing special education and related support services to David based on his individual needs and that it was in compliance with Section 504.

Next, David's parents requested a due process hearing. One was scheduled for 23 May 1990, but on 18 May 1990, the Swifts and their attorney met with special education officials from the School Board. It was agreed that rather than hold the hearing on 23 May, an independent evaluation of David would be scheduled with LSU Medical Center in Shreveport, Louisiana.

On 15 August 1990, the evaluation team (an educational consultant, a psychologist, and a child neurologist) reported that David had made progress in math, reading, and language since the October 1988 evaluation, but that his relative standing in comparison to his peers remained unchanged. It was found that David's behavioral problems had become more severe. The team was of the unanimous opinion that David needed residential placement if his behavior problems were to be stabilized and his best opportunity for developing functional living skills was to be realized.

On 30 August 1990, David's parents admitted David to Southeast Louisiana State Hospital, an acute-care psychiatric hospital in Mandeville, Louisiana. On 2 October 1990, David's parents requested that he be discharged because their insurance carrier had terminated payments. In their discharge summary, the professionals at this hospital recommended that David be placed at a residential facility. David's parents immediately requested a due process hearing.

## III. ADMINISTRATIVE PROCEEDINGS

The due process hearing was conducted by an independent hearing officer on 5 December 1990. Evaluation reports, IEP's, memoranda, and other documents reflecting the events up to this date were admitted into evidence. In addition, testimony was given by David's parents, J. Michael Cook (special education consultant on LSU team in 1988 and 1990), John Eubanks (psychologist and pupil appraisal manager for the School Board), Carole Dayan (pupil appraisal coordinator for the School Board and former principal of a residential facility), and Carla Miller (David's teacher). On 7 January 1991, the hearing officer concluded that because David's medical and educational needs were so intertwined as to be inseparable, residential placement was necessary for David to receive a free appropriate public education.

The defendants appealed to the Louisiana State Department of Education. On 8 March 1991, a state level review panel reversed the hearing officer's decision, concluding that a preponderance of the evidence did not support a finding that David's current placement was inappropriate. On 18 April 1991, the Swifts filed this suit, seeking judicial review of the panel's decision pursuant to 20 U.S.C. § 1415(e)(2).

## IV. POST–HEARING EVIDENCE

Since the review panel's decision, David's parents have had additional evaluations performed on David. Psychologist Addison Sandel, Ph.D., evaluated David on several occasions from August 1991 through May 1992. Sandel's tests show that while David's verbal I.Q. has remained in the average range and relatively stable, his performance score has dropped 29 points since the test was last conducted in 1988.

Sandel believes that David's behavioral problems have become more severe and are interfering with his ability to progress academically. In Sandel's opinion, David needs residential care to stabilize him sufficiently to benefit from academic instruction. Psychologist G. Perry Hill, Ph.D., who was a member of the LSU teams in 1988 and 1990, evaluated David independently in June 1992. Hill believes that David's behavior is becoming worse as he grows older and that he cannot be safely maintained in a home environment. David's parents also submit the affidavit of Carla Miller, David's teacher during the 1990–91 and 1991–92 school years, which states that David's behavior grew worse over the course of these two years. (Miller resigned from the school system in April 1992).

David's adoptive parents each submit affidavits stating that David's aggressive behavior has increased over the past three years. They state that since April 1992, they have taken David to the emergency room at least three times for injuries received at school, either from fights with students or corporal punishment. They believe that David has regressed academically. It is their opinion that David is incapable of understanding the difference between right and wrong. At home, David engages in dangerous behavior such as driving the riding lawnmower across a busy street, operating his father's power tools, sticking screwdrivers into electrical outlets, and attempting to start the family car. According to David's parents, he is abusive to animals and other children. David has stopped obeying his mother, who is physically disabled, so that she can no longer control him. The Swifts state that they have exhausted their savings trying to help David.

The affidavits submitted by the education professionals who work with the School Board paint a different picture of David. They insist that David is not violent while at school and that he clearly knows the difference between right and wrong. School Board psychologist John Eubanks, Ph.D., reports that David has progressed academically and can continue to do so. Elwood Dyess, principal at L.S. Rugg Elementary where David attended from fall of 1989 through the spring of 1992, attests that no acts of violent or aggressive behavior by David toward other students were reported to him, except one incident in which David poked another student in the buttocks with a pencil. Connie Dingeldein, David's teacher at Lincoln Road Sixth Grade Center (where David has attended since the start of the 1992–93 school year) states that David has exhibited no violent or dangerous behavior in the classroom and that she believes David can make significant academic progress in a self-contained BD/ED classroom on a regular school campus. She reports that he is now functioning on the fourth-grade level in mathematics, reading, spelling, and social studies, and on the third-grade level in English. David's principal at Lincoln Road, Rick Tison, has previously served in a residential facility. He agrees that David has exhibited no violent behavior and that David does not need residential placement to receive an appropriate education. Finally, Robert Cyphert, director of special education for the School Board, states that the School Board serves 106 BD/ED students, many of whom exhibit behavior problems far more severe than David's.

## V. APPLICABLE LAW AND ANALYSIS

### A. *Standard of Review*

■ Under 20 U.S.C. § 1415(e)(2), the reviewing court's role is to review the records of the administrative proceedings and any additional evidence that the parties may request, and basing its decision on the preponderance of the evidence, to grant such relief as it determines is appropriate. 20 U.S.C. § 1415(e)(2). The Supreme Court has read the text and legislative history of § 1415(e)(2) as directing courts "to make 'independent decision[s] based on a preponderance of the evidence.' " [5] *Board of*

---

**5.** The plaintiff seems to suggest that this court's role is limited to determining whether the review panel exceeded its authority and if it did, reinstating the hearing officer's decision. The

*Educ. v. Rowley*, 458 U.S. 176, 205, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982) (quoting S.Rep. No. 455, 94th Cong., Sess. at 50 (1975)). The relief granted must be appropriate in light of the Act's purpose, which is to provide children with disabilities "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." *School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985).

■ The inquiry under § 1415(e)(2) is twofold. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. First, has the State complied with procedural requirements under the Act? Second, is the child's IEP "reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206–07, 102 S.Ct. at 3051. Here, the procedural requirements have been met and are not challenged. Thus, the question before us is whether David's placement in a self-contained ED/BD classroom on a regular public school campus is reasonably calculated to enable David to receive educational benefit.

**B.   *What the Act Requires***

■ The EACHA (now IDEA) is an equal access statute. It requires states to accept children with disabilities into their public schools. *See Rowley*, 458 U.S. at 202, 102 S.Ct. at 3049; *see also Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047 (5th Cir.1989). The Supreme Court has determined that this access must be meaningful; that is, it must be reasonably calculated to confer some educational benefit on the child. *Rowley*, 458 U.S. at 200, 102 S.Ct. at 3048; *Daniel R.R.*, 874 F.2d at 1047. Where possible, this education must be provided in a regular public school with the child participating as much as possible in the same activities as able-bodied children. *School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). Where this is not possible, the Act provides

for placement in private schools at public expense. *Id.*

The responsibility "for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051. In light of this discretion given to school authorities, the Fifth Circuit has held that the Act "creates a presumption in favor of the education placement established in [a child's] IEP." *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1291 (5th Cir. 1991) (quoting *Tatro v. Texas*, 703 F.2d 823, 830 (5th Cir.1983), *aff'd*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984)). The party challenging the placement "bears the burden of showing why the educational setting established by the IEP is not appropriate." *Id.* Thus, the plaintiff bears the burden of proving that instruction in a self-contained classroom with other BD/ED students on a regular public school campus fails to provide David with any meaningful benefit. The plaintiff fails to carry this burden.

**C.   *Analysis***

The majority of psychologists and psychiatrists who have evaluated David believe that placement in a residential facility is necessary for David to make academic progress and to realize his ability. David's parents seem to argue that this should end the inquiry—a head-count of clinical experts indicates that residential placement is necessary for David to make progress consistent with his abilities; therefore, the state must provide it free of charge. This is not what the Act requires. The Swift's analysis ignores the many other considerations that must be balanced under the Act. As the Fifth Circuit recently explained, "[t]he concern for enhancing the disabled child's ability to obtain educational benefit must be balanced with concerns about limited public resources, the need to provide basic educational opportunities to disabled and able-bodied children alike, and

Supreme Court, however, has made it clear that our role is to make an independent decision, giving due deference to the expertise of school

authorities. *See Board of Educ. v. Rowley*, 458 U.S. 176, 205–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982).

the concern to serve the disabled child in the environment which is least restrictive of the child's liberty." *Sherri A.D. v. Kirby*, 975 F.2d 193, 207 (5th Cir.1992).

██ We do not doubt that placement in a residential facility could benefit David. But the Act "does not mandate that every child with a disability receive optimal services." *Sherri A.D.*, 975 F.2d at 206. What the act requires is "that 'appropriate' educational services be delivered in the least restrictive environment available, with a preference for mainstreaming when possible."[6] *Id.* at 207. The standard for "appropriateness" of a free public education is access to specialized instruction and related services that are individually designed to confer *some* meaningful educational benefit on the child. *Rowley*, 458 U.S. at 200–01, 102 S.Ct. at 3048.

██ We are convinced that David is receiving meaningful educational benefit in his current placement. He is in a self-contained BD/ED classroom with a teacher's aide, computers, and a teacher certified in special education. The teacher and aide devote their attention exclusively to David and the five other BD/ED students. During physical education class, recess, and lunch, David is allowed to interact with able-bodied children. He is performing math, reading, and spelling on the fourth-grade level and English on the third-grade level.

Perhaps David is capable of much more. Perhaps residential placement would increase the benefit David receives. But the Act does not require the School Board to maximize David's potential. *Rowley*, 458 U.S. at 198, 102 S.Ct. at 3046. The Supreme Court has cautioned that reviewing courts are not "to substitute their own

notions of sound educational policy for those of the school authorities which they review." *Id.* at 206, 102 S.Ct. at 3051. David's teachers and principals, as well as the special education officials for the School Board, believe that David is making academic progress and receiving educational benefit in his current placement. The plaintiff has failed to demonstrate otherwise.

As for David's home environment, it is clear that David's parents feel that they can no longer control him. As David grows older, becoming physically stronger and no doubt more rebellious, they also are growing older. Mr. Swift is retired and Mrs. Swift is disabled. While this court is sympathetic to their position, it is not the legal responsibility of the School Board to remedy problems with David in the home. It is our hope that rather than spending the next two critical years of David's life appealing this court's decision, both the parents and the School Board will set aside differences and sincerely work *together* toward giving David an opportunity for a rewarding life.

For these reasons, the decision of the state level review panel for the Louisiana Department of Education is AFFIRMED. It is ordered that JUDGMENT IS HEREBY RENDERED in favor of defendants the Rapides Parish Public School System and Allen Nichols in his official capacity as Superintendent of the Rapides Parish Public School System on all claims in this matter, and all plaintiff's claims against the defendants are hereby DISMISSED.

---

6. The EAHCA (now IDEA) requires states to "mainstream" disabled children with able-bodied children whenever possible. *See Sherri A.D.*, 975 F.2d at 206–07 (citing *Rowley*, 458 U.S. at 202–03, 102 S.Ct. at 3049). "Even in cases in which mainstreaming is not a feasible alternative, there is a statutory preference for serving disabled individuals in the setting which is least restrictive of their liberty and which is near the community in which their families live." *Id.* The concept of "least restrictive environment" includes "not only freedom from physical restraint, but the freedom of the child to associate

with his or her family and with able-bodied peers." *Id.* at 207 n. 23.

The Fifth Circuit has recognized that "educational benefits are not mainstreaming's only virtue." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047 (5th Cir.1989). It provides behavior models from able-bodied children that may be essential to the child's development. *Id.* at 1048.

David's current IEP allows him to participate with able-bodied children in recess, lunch, and physical education class.