CHRIS D. and Cory M., etc., Plaintiffs,

v.

**MONTGOMERY COUNTY BOARD OF EDUCATION, et al., Defendants.**

Civ. A. No. 89–T–1165–N.

United States District Court, M.D. Alabama, N.D.

July 2, 1990.

---

Patricia E. Ivie, Robert J. Varley, Legal Services Corp. of Ala., Montgomery, Ala., for plaintiffs.

Vaughan H. Robison, Justice D. Smyth, III, Montgomery, Ala., for defendants.

MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

In this case, plaintiff Chris D.,[1] an emotionally disabled student, contends that de-

---

1. At Chris's request, his full name has been filed under seal with the court.

fendant Montgomery County Board of Education has failed to provide him with the "free appropriate public education" to which he is entitled under the Education of the Handicapped Act (EHA).[2] 20 U.S.C.A. §§ 1401 *et seq.* This action is being brought on Chris's behalf by his mother.[3] Based on the evidence presented, the court concludes that the school board must place Chris in a full-time residential school.[4]

## I. BACKGROUND

Chris is a 12 year-old boy who, until March of this year, was in the sixth grade in the Montgomery County public school system. Although Chris exhibited very poor grades and severely disruptive behavior as early as the second and third grades, he was not diagnosed as "emotionally conflicted" until May 1987, when his mother requested that he be evaluated for special education. The events giving rise to this lawsuit focus mainly on Chris's last three years in the Montgomery school system.

### A. 1987–88 School Year

At the beginning of the 1987–88 school year, Chris received his first placement designed to address his behavioral difficulties. He was placed in the Davis Learning Center, a public school offering only special education programs. Because he made substantial academic progress and had no major behavioral incidents during the year, the school staff recommended that he return to a regular elementary school the next year.

### B. 1988–89 School Year

The 1988–89 school year was very difficult for Chris. He was placed at Bear Elementary School in regular classes with special support for his behavior problems. Almost immediately, Chris began exhibiting behavioral problems which disrupted his classes and resulted in his frequent referral to the principal's office. He became involved in fights with other students, misbehaved in class and on the bus, used profanity, stole money from school personnel, and beat on the walls of the principal's office when called there for disciplining. The police were called in to intervene on at least one occasion.

In November, the school system returned Chris to the Davis Learning Center. At Davis, however, Chris continued to have severe emotional and social problems similar to those he had at Bear. He used vulgar language with teachers and other students, he refused to do his work, and he disrupted classroom activities. Finally, in December, Chris's mother removed him from the school system because the principal at Davis had severely paddled Chris for misbehaving.[5] As a result of the paddling, Chris became distrustful of the staff at Davis and exhibited a strong desire for revenge.

In January 1989, Chris's mother met with school officials and requested that Chris be placed in a residential school where he could be supervised 24 hours a day and could receive continuous behavior training. School officials persuaded Chris's mother to return him instead to Bear Elementary where he could attend a special education class for the full day. At Bear, Chris continued to manifest severe social and emotional behavioral problems, and the police were again called in to help handle him.

---

2. Chris also claims that the school board has violated rights guaranteed by the equal protection and due process clauses of the fourteenth amendment to the United States Constitution. However, because Chris has relied on only his EHA claim, the court does not address his other theories.

3. Chris's mother has named as defendants the Montgomery County Board of Education and its superintendent and special education coordinator. Because the superintendent and the coordinator are sued in their official capacities only, the court does not consider them to be separate from the school board, and the court therefore

refers to all three defendants as the Montgomery County Board of Education.

4. In an amended complaint, a second plaintiff, Cory M., was added and both Chris and Cory indicated their intent to bring this case as a class action. Cory's case will be heard later, and the court has not yet determined whether this action should proceed as a class action.

5. The evidence reflects that the principal hit Chris three times on the buttocks with a paddle while two teachers were holding him face-down on the floor. Chris's mother removed him from the school system on the advice of a psychologist.

### C. 1989-90 School Year

The 1989-90 school year was even more difficult for Chris. His mother again requested residential placement, but the school system refused to make any changes in his placement at Bear. Chris's mother immediately sought administrative review and, when that proved unsuccessful, filed this lawsuit.

During the fall of 1989 Chris continued to exhibit behavioral problems at Bear, including hitting other students, which resulted in the police department being called on one occasion. In November 1989, Chris was suspended from Bear. The problems continued after Chris returned from his suspension until finally, on February 6, 1990, he was suspended indefinitely as a result of a severe outburst of disruptive behavior. After informal discussions with the court, the school board and Chris's mother agreed to return him to the special education class at Bear, pending final resolution of this lawsuit. However, on March 28, less than two weeks after returning to school, Chris became aggressive and disruptive again. An officer from the local police department was again called and, after an unsuccessful attempt to talk to Chris, the officer handcuffed Chris and removed him from school grounds. Charges were subsequently brought against Chris in juvenile court. Chris has not returned to school since that day.

Both Chris's mother and the Montgomery County School Board responded to this last development by filing motions seeking preliminary injunctive relief pending the outcome of this litigation. Chris's mother again requested that the school board be required to place Chris in a residential school. The school board offered instead to return him to the Davis Learning Center. The United States Magistrate who heard the motions recommended that the court issue a preliminary injunction embodying a compromise plan that would require the school board to provide Chris with academic instruction in his home for a minimum of six hours a day, including the summer months. Chris's mother objected,

contending, first, that the plan was inappropriate for Chris and, second, that the family's modest apartment is too small to accommodate Chris, his instructor, and an aide. Chris's mother uses the apartment as a day care center for several children, and, in addition, Chris's brother and sister are at home during the summer months. The school system then proposed a plan under which Chris would receive individual instruction in a room in a school system administrative building, but away from all other children.

The magistrate later issued a supplemental report agreeing with Chris's mother and recommending that, pending disposition of this lawsuit, the school board should be required to place Chris in a residential school. This recommendation was based on findings that for Chris, "any interim placement must include a behavior modification component" which requires "the opportunity to interact with other students" and that neither individual instruction at home nor individual instruction in an administrative building away from other children could meet this requirement. The magistrate also concluded that Davis Learning Center was inappropriate for Chris. The school board objected to this supplemental recommendation.

Shortly after this cause had been submitted to the court on the magistrate's initial and supplemental recommendations, the parties informed the court that it could deny both motions for preliminary injunctions and could consider the case as having been submitted for final resolution.[6] By order entered contemporaneously with this memorandum opinion and attendant judgment, the court has denied both motions for preliminary injunction and now reaches final disposition of Chris's claim.

### II. DISCUSSION

Now that this cause is ready for final disposition of Chris's EHA claim, the court must view the case from a perspective significantly different from that of the magistrate's. The focus of the magistrate was on where Chris should be placed until the court could reach the merits, if any, in the

---

**6.** The parties made this representation to the court at the pretrial conference on June 26, 1990.

claim his mother filed in this court.[7] However, the issue of Chris's placement is no longer one of interim relief as the magistrate saw it, but 'of final disposition as to both liability and relief. The court must now decide whether the claim filed by Chris's mother has merit and, if so, what relief is appropriate.[8]

## A. Liability

The EHA provides federal funds to assist state and local governments in educating handicapped children. As a condition for funding, states are required to provide a "free appropriate public education" for all disabled children within their jurisdictions. 20 U.S.C.A. § 1412(2)(B). Towards this end, the Act confers on handicapped students both procedural and substantive rights. *Honig v. Doe*, 484 U.S. 305, 307–11, 108 S.Ct. 592, 596–97, 98 L.Ed.2d 686 (1988). As to the former, "the Act establishes a comprehensive system of procedural safeguards designed to ensure parental participation in decisions concerning the education of their disabled children and to provide administrative and judicial review of any decisions with which those parents disagree." *Id.* at 308, 108 S.Ct. at 596. Chris's mother does not claim that the Montgomery County School Board has violated the Act's procedural requirements. Her claim is substantive only.

As to the latter, a disabled student has two complementary substantive rights under the EHA. First, a disabled student has a right to "personalized instruction with sufficient support services to permit the child to *benefit educationally* from the instruction."[9] *Board of Education v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982) (emphasis added). Second, a disabled student has a right to be "mainstreamed"—that is, placed in the "least restrictive environment" possible. *Martinez v. School Board of Hillsborough County*, 861 F.2d 1502, 1505 (11th Cir.1988). Under this requirement, a handicapped child may be removed from the regular classroom setting "only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*, quoting 20 U.S.C.A. § 1412(5)(B). *See also Honig*, 484 U.S. at 311, 108 S.Ct. at 597.

With this lawsuit, Chris's mother challenged his placement at Bear Elementary School. Both Chris's mother and the school board now agree that Chris's continued placement at Bear is not appropriate. The issue for the court, therefore, is not whether Chris's placement at Bear meets the EHA's requirements, but rather what relief the court should afford now that the parties have agreed that his present placement is inappropriate.

## B. Relief

The school board has offered three alternatives for relief. They suggest, first, that Chris be returned to Davis Learning Cen-

---

**7.** The starting point of any request for interim relief in EHA cases is the Act's "stay put" provision. 20 U.S.C.A. § 1415(e)(3). *See Honig v. Doe*, 484 U.S. 305, 307–09, 108 S.Ct. 592, 596, 98 L.Ed.2d 686 (1988) (discussing the stay-put provision).

**8.** As is required by 28 U.S.C.A. § 636(b)(1)(B), this court has read the transcript of the proceedings before the magistrate and reviews the magistrate's recommendations de novo. *See Jeffrey S. v. State Board of Education*, 896 F.2d 507, 512–13 (11th Cir.1990). In any event, the change in the posture of this case requires the court to review this case de novo.

**9.** The vehicle for delivery of this personalized instruction is the "individualized educational program" or IEP. *Honig*, 484 U.S. at 311–13, 108 S.Ct. at 598. The IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improve-

ments in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives. [20 U.S.C.A.] § 1401(19)." *Honig*, 484 U.S. at 311, 108 S.Ct. at 597. The Act requires that an IEP be developed for each disabled child and that it be the product of a meeting between a representative of the local school district, the child's teacher, and the child's parents or guardian. § 1401(a)(19). The IEP must reviewed and, if necessary, revised, at least once a year. A parent or guardian who disagrees with a child's IEP may seek administrative review and, if that proves unsatisfactory, may file suit in a federal or state court. § 1415(b), (c), & (e)(2).

For each year since Chris was diagnosed as being emotionally conflicted, he has had an IEP developed for him. In fact, this lawsuit originated when Chris's mother challenged his IEP to the extent it provides for placement at Bear Elementary School rather than in a residential school.

ter; second, that he receive individual instruction at his home; and, third, that he receive individual instruction in an administrative building separate from all other children. Chris's mother opposes these options, contending that a residential school is the least restrictive facility that will provide him some educational benefit. The court agrees with Chris's mother that the EHA requires that Chris receive residential placement.

### i. Chris's Needs

The expert testimony is undisputed that behavior modification is an essential element of any placement program for Chris.[10] The chief impediment to Chris's ability to function academically in the school system is his inability to control his behavior. Unless and until his behavior is controlled, he will not be able to function at all in the school system, let alone in a regular classroom setting. This fact is made evident by his suspensions from Bear Elementary because of severe disruptive behavior.

The evidence is also clear that Chris's behavior problems cannot be redressed in an isolated environment. Any behavior modification program for Chris must include interaction with his peers. As one educational expert explained to the court,

> students with behavior problems, such as those demonstrated by Chris D., demonstrate such problems only in a social setting where they interact with other students and adults. Since the problems occur in such settings, the intervention must take in these settings in order to be effective. Chris must receive training in anger control skills, conflict resolution, compliance and adult/peer relationships in a setting where there are adults, peers, situations which make him angry, etc.

In other words, because situations involving other students and adults usually give rise to Chris's behavior problems, he must be in these settings if his behavior problems are to be addressed successfully. He cannot be warehoused away so as to avoid his behavior problems.

Finally, the court agrees with the expert testimony that Chris's behavior problems, which have been left untreated over the years by the school system, have deteriorated to a level of intensity and chronicity that any placement program must provide him with consistent and systematic around-the-clock behavioral training.

### ii. The Davis Learning Center

The school board's first suggestion—the Davis Learning Center—can no longer be considered educationally beneficial for Chris. Although Chris's first placement at Davis was relatively successful in the sense that he had no major behavioral difficulties, the court agrees with the expert testimony in this case that the school still failed to address his primary problem: controlling his behavior himself. Chris's behavioral problems stem from the fact that he has not yet learned how to control his own behavior. Chris was not successfully taught the skills necessary to control his anger during his first placement at Davis, and the current program at Davis is inadequate to teach him the behavioral skills he needs in order to control his behavior for himself. Thus, Davis is not adequate to provide him the behavior modification he needs.

The court also agrees with the educational experts that it is apparent from Chris's second stay at Davis that the school is not appropriate for him. First of all, corporal punishment was inflicted on Chris in a manner which destroyed his trust in the staff and instilled in him a strong desire for revenge. Second, the Davis staff is not capable of handling Chris physically; the school's primary means of controlling behavior, corporal punishment, is not effective with Chris. As a result, according to the experts, Chris's return to Davis would be even more disastrous than the last time. This conclusion is reinforced by the principal of Davis, who has candidly stated that Chris's return to the school would not be beneficial to him.

The school board contends that Chris would be able to receive the necessary edu-

---

10. The expert testimony in this case came primarily from Dr. Howard Knoff and Dr. George Batsche, two school psychologists. They had the opportunity to observe Chris in class at Bear and to analyze extensively, including on-site visits, the programs at Bear, Davis, and two other schools.

cational benefit from the program at Davis if the court issued an order directing that no corporal punishment be inflicted on him. However, the school board has offered no evidence to support this assertion; the board has not explained how it intends to control Chris's behavior, with or without corporal punishment, and the board has offered no plan for teaching Chris to control his own behavior. In any event, the principal of Davis has stated that she considers corporal punishment an essential part of the program at Davis and that she will not accept a student unless she has permission to administer corporal punishment. Moreover, there is no evidence that a court order would in any way alleviate Chris's fear of the staff and his desire for revenge, two obstacles which would prevent him from making educational progress at Davis.

Finally, even if Davis Learning Center could provide Chris with some behavior modification training, it cannot give him the consistent and systematic around-the-clock treatment he now needs.

iii. Homebound Instruction and Isolated Instruction in an Administrative Building

The school board's other two suggestions—homebound instruction and isolated instruction in an administrative building—also will not meet Chris's minimal needs. As this court explained earlier, any placement for Chris must address at least two concerns. First, until Chris is able to control his behavior, he will never be able to benefit academically. Second, because situations involving other students and adults usually give rise to Chris's behavior problems, he must be in these settings if school officials are to address his problems successfully.

Educating Chris in either of the two settings suggested by the school board will result in his total isolation from his peers. These two settings will provide Chris no occasions to interact with other students, and, as a result, they will provide no opportunity to redress his behavior problems. In

the words of one of the expects who testified before the court, attempting to teach Chris in the placements suggested by the school board would be "similar to trying to teach swimming in a place where there was no water." [11]

Three other considerations also counsel against placing Chris in either of these two settings. First, the settings suggested by the school board cannot offer Chris the around-the-clock treatment he needs. Second, according to Chris's mother, there is not enough room in her apartment for Chris to be educated there. And finally, the court finds credible the testimony of experts to the effect that the school system does not have personnel who are capable of managing and working with a child as emotionally disturbed and physically aggressive as Chris.

It is apparent that the thrust of the school board's proposals is to hide Chris away so that he cannot disrupt the on-going education of other students. The true intended beneficiary of the proposals is the school system and not Chris. The school board overlooks, however, that, as with most hidden human problems, Chris's problems will not go away—they will only grow worse.

iv. Residential Placement

In contrast to the suggestions of the school board, Chris's mother has proposed that he be placed in a residential school. Chris's mother has informed the court that she has found a residential school willing to accept Chris, and that a place has been reserved for him subject to the outcome of this lawsuit.

It is uncontroverted that a residential school would meet two of Chris's essential needs under the EHA. First, a residential placement will provide him with the basic education he needs. Second, it will offer an environment in which school staff can work effectively with Chris in controlling his behavior; residential placement will allow for around-the-clock treatment and it will offer Chris the needed opportunity to interact with other students.[12] Indeed, the

---

11. Affidavit of George M. Batsche, Ed.D., dated May 2, 1990, attached to Plaintiff's Objections to Magistrate's Recommendation of May 3, 1990.

12. It is significant that the residential program suggested by Chris's mother works toward a goal of returning its children to less restrictive school environments after 12–24 months of be-

school board has not contested the appropriateness of residential placement; it has merely claimed that a residential placement exceeds the EHA's requirements.[13] *See Manecke v. School Board of Pinellas County, Fla.*, 762 F.2d 912, 917 (11th Cir. 1985) ("if necessary to give a handicapped child special education and related services, the state must place that child in a public or private residential program at public expense"), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986); 34 C.F.R. § 300.302 (requiring placement in public or private residential program at state expense if necessary to provide special education program and related services to handicapped child).

Educating Chris in a residential school is also compelled for another reason. The EHA requires that disabled children be "mainstreamed" or educated in the "least restrictive environment." *Martinez v. School Board of Hillsborough County,* 861 F.2d 1502, 1505 (11th Cir.1988). The school board's two suggested alternatives—individual instruction at home or in an isolated room in an administrative building—would violate this requirement because they would offer Chris no opportunity to return to the regular class setting, which, of course, would be the least restrictive environment for any student. Until his behavior improves dramatically, Chris cannot return to a public school classroom, and, as explained above, the two isolated settings suggested by the school board do not provide any opportunity for Chris to learn behavior control skills. In contrast, residential placement would provide for this needed behavior modification and thus, potentially, for Chris to return to a regular

classroom or school setting as soon as is reasonably possible.

Moreover, residential placement itself is a less restrictive placement than homebound instruction or individual instruction in an administrative building. The Alabama State Department of Education has developed a continuum of options for the placement of children in need of special education and related services.[14] Under these options, the homebound instruction proposed by the school board is listed as a more restrictive option than the full-time residential school placement. Thus, the EHA's goal of placing students in the least restrictive environment possible favors residential placement over homebound instruction, and this would be true even if the court had determined that homebound instruction for Chris would fulfill the minimum requirements of the EHA.

Although the school board's proposal of isolated individual instruction in an administration building room does not expressly fit within any of the options set forth in the state's continuum of options, it appears to be most similar to a homebound program. As with the homebound instruction, Chris would not be in a classroom setting at all during the day, he would not receive instruction with other children, and his academic instruction would not even take place on a school campus. The school board's proposed instruction in an administrative building is simply a variation on the homebound instruction placement, and, therefore, the EHA's least restrictive requirement favors residential placement.

Finally, the Alabama special education policy manual directs that special education students should receive academic instruction in a "non-school" environment only if

havior modification training and academic instruction. The school board has not given the court any indication as to the expected duration of its proposal for individual instruction at home or in an administrative building, or of how its plan would prepare Chris to return to a less restrictive learning environment.

13. The cost of placing Chris in the residential program selected by his mother will be between $55 and $65 a day. The court believes that this cost, in relation to the costs of other alternatives, is reasonable.

14. The options on this continuum, from least restrictive to most restrictive, are: (a) access to

a support service coordinator; (b) indirect educational services provided in the regular program; (c) direct educational services provided in the regular program; (d) resource room services; (e) special education class with part-time regular program; (f) self-contained special class; (g) public day school program; (h) private day school program; (i) public residential school/facility; (j) private residential school/facility; (k) homebound/hospital program. Division of Student Instructional Services, Alabama State Department of Education, Bulletin No. 36, Special Education Policy Manual 34–36 (1986).

their "special education needs cannot be met within a school/facility program." [15] The school system's proposal for instruction in an administrative building would provide Chris with instruction in just such a "non-school" setting. The plan would deprive Chris of virtually all contact with other children during the school day. In contrast, residential placement would provide Chris with education within a school program, albeit a non-traditional school program. Therefore, under this policy for "non-school" placement, the school system's proposed instructional setting would be more restrictive than a full-time residential school program.

### C. Other Comments on Relief

The school board correctly observes that the EHA requires that a school district provide only "educational benefit" to Chris. *Rowley*, 458 U.S. at 201, 102 S.Ct. at 3048. The school board argues that Chris will receive *some* educational benefit under either of their two proposals of homebound instruction or individual instruction in an administrative building. The court cannot agree.

Under the test the school board is implicitly proffering, a benefit is conferred anytime a student is not left to vegetate. The court agrees with the Third Circuit Court of Appeals that the EHA cannot be so trivialized. "[T]he Act requires a plan of instruction under which educational *progress* is likely." *Board of Education of the East Windsor Regional School District v. Diamond*, 808 F.2d 987, 991 (3rd Cir.1986) (emphasis in original). "The Act ... requires a plan likely to produce

progress, not retrogression or trivial educational advancement." *Id.* Applying the Third Circuit's understanding, the court must conclude that the Act's requirements have not been met by educational proposals which would isolate Chris educationally and socially, allow his ability to interact with others to regress further, and offer him no hope of returning to any classroom setting, either regular or special.

The school board correctly adds that the EHA does not require a school district to maximize the educational benefit for the disabled. *Rowley*, 458 U.S. at 197 n. 21, 102 S.Ct. at 3046 n. 21. The board argues that residential placement of Chris will do just that. This court, having determined that only a residential program will provide an appropriate education for Chris, responds in the same words as did the Third Circuit in *Diamond:*

> If, incidentally, that program does in fact "maximize" his potential, so much the better; however, this Court has not measured the inadequacy of [the school board's] plan against any maximization standard. That plan falls because of its failure to meet the express requirements of EHA itself.

808 F.2d at 992, *quoting Board of Education of the East Windsor Regional School District v. Diamond*, No. 83–2364, at 12–13 (D.N.J. Oct. 4, 1985).

Finally, the court has not been unfaithful to the Supreme Court's directive that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.[16] Chris's EHA

---

15. Division of Student Instructional Services, Alabama State Department of Education, Bulletin No. 36, Special Education Policy Manual 36 (1986).

16. The Supreme Court has instructed that, even though the Act authorizes courts to make their decisions based on a "preponderance of the evidence" and to "grant such relief as the court determines is appropriate," 20 U.S.C.A. § 1415(e)(2), courts should give substantial deference to the decisions of state administrative hearing officers if the Act's procedural requirements have been followed. *Rowley*, 458 U.S. at 205–07, 102 S.Ct. at 3050–51. The Supreme Court explained in *Rowley* that the comprehensive procedural safeguards in the Act, including extensive participation by parents and guardi-

ans at all stages, reflected a Congressional belief that full compliance with these safeguards would assure in most cases that the substantive requirements of the Act have been met as well. *Id.*

In this case, the school system followed the procedures required by the EHA, including developing an IEP which placed Chris in the class for emotionally conflicted students at Bear Elementary School, giving Chris's mother adequate notice, and holding a due process hearing on her objections to the IEP. This case is different, however, because, although the procedural requirements have been met, the parties agree that the decision of the administrative hearing officer placing Chris at Bear is no longer appropriate, if it ever was. This court, therefore,

claim has not presented a battle of the experts, in which a court must choose between competent expert testimony presented by both sides to an issue. Here, the school board has presented no credible evidence in support of its proposals or in opposition to Chris's mother's.[17] Chris's mother, in contrast, has presented substantial expert testimony in support of her contentions that the school board's proposal would fail to provide any educational benefit for Chris and that her proposal is the only appropriate choice under the EHA.

## III. CONCLUSION

Having carefully considered the school system's proposed placements and all the evidence presented by both parties, the court concludes that Chris should be enrolled immediately in a full-time residential school in order to receive the individual instruction and special services necessary for him to receive any benefit educationally. The school board's proposed placement at Davis Learning Center is wholly inappropriate for Chris in light of his past experience there and the inadequacy of the Davis program. The school board's alternative proposals for homebound instruction or individual instruction in an administrative building are inappropriate because they will not give Chris the opportunity to make educational progress, because both are more restrictive environments than residential placement, and because neither offers an opportunity for Chris to return to the least restrictive environment of a regular classroom setting.

An appropriate judgment will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of plaintiff Chris D. and against defendants Montgomery County Board of Education, its Superintendent, and its Special Education Coordinator;

(2) That defendants Montgomery County Board of Education, its Superintendent, and its Special Education Coordinator, and their officers, agents, servants and employees and those persons in active concert or participation with them who receive actual notice of this order, be and they are each hereby ENJOINED and RESTRAINED from failing forthwith to provide "residential placement" for plaintiff Chris D.

It is further ORDERED that plaintiff Chris D. is allowed until the completion of all claims in this litigation to file any request for attorney's fees, expenses, and costs.

cannot give deference to the decision of the hearing officer.

However, the fact that the parties agree that the decision of a hearing officer should not be followed does not mean that courts should freely "substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206, 102 S.Ct. at 3051. The primary responsibility for educating handicapped children, including determining how they are to be educated, is with the state. *Id.* at 207–08, 102 S.Ct. at 3051–52.

**17.** At the hearing before the magistrate, the school board presented the testimony of Kathy Farquhar, Chris's teacher at Bear; Lois Johnson, the principal at Bear; and Pat Clark, a special education teacher in the Autauga County school system. Although Clark has a masters degree in special education and was formerly employed as an educational specialist for the Alabama department of Public Education, the court cannot treat her testimony as expert evidence in this matter. The defendants did not introduce Clark's resume or curriculum vitae, and they gave the court only a brief sketch of her educational background. More importantly, Clark had never observed Chris in a classroom setting, or even met him, before she testified. She also had not talked to Chris's mother. Clark did discuss Chris's situation with the principal at Bear and had reviewed Chris's records, but she did not testify that she had spoken to any of Chris's teachers or to the principal of Davis about Chris. In any event, the court has basic questions about the credibility of Clark's testimony, given that Clark incorrectly testified that homebound instruction is a less restrictive option on the state's special education continuum than is a full-time residential placement.