**Richard and Pat HALL, on their own behalf and as of Next Friends of their son, Michael John Hall, Plaintiffs,**

v.

**SHAWNEE MISSION SCHOOL DISTRICT (USD NO. 512), Shawnee Mission School Board, and Kansas State Board of Education, Defendants.**

Civ. A. No. 92–2322–GTV.

United States District Court,
D. Kansas.

June 23, 1994.

Mark E. Jones, Timothy J. Sear, Polsinelli,
White, Vardeman & Shalton, Overland Park,
KS, Thomas P. O'Donnell, Polsinelli, White,

Vardeman & Shalton, Kansas City, MO, for plaintiffs.

David J. Adkins, Bennett, Lytle, Wetzler, Winn & Martin, Prairie Village, KS, for defendants.

Dan Biles, Gates & Clyde, Chartered, Overland Park, KS, for Lee Droegemueller, Com'r of Educ., Betty Weithers, Secretary Director for Special Educ., Kansas State Bd. of Educ., USD No. 512 School Bd., Shawnee Mission, KS.

## MEMORANDUM AND ORDER

VAN BEBBER, District Judge.

This action is brought by Richard and Pat Hall on behalf of their disabled son Michael. The Halls seek to recover the costs of Michael's placement at a private residential facility from the defendant Shawnee Mission School District under the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, et seq. [IDEA] The Halls claim that the defendants failed to provide Michael with an adequate educational benefit and that the Halls were compelled to unilaterally withdraw Michael from the Shawnee Mission School District and place him at their own expense in a closely structured residential setting school environment, the Gillis Center. The issue before the court is whether the Shawnee Mission School District must reimburse the Halls for the costs of Michael's placement at the Gillis Center. For the reasons set forth in this Memorandum and Order, the court concludes that the plaintiffs are not entitled to recover their expenses of placing Michael at the Gillis Center.

### I. Statutory Overview and Standard of Review

The Individuals with Disabilities Education Act requires states to provide disabled children with a "free appropriate public education." 20 U.S.C. § 1401(a)(18). The term "free appropriate public education" means special education and related services. 20 U.S.C. § 1401(a)(16)–(18). Section 1401(a)(18)(A) requires that the education be "provided at public expense, under public supervision and direction."

IDEA section 1401(a)(18)(D) requires schools to provide a unique, individualized education program [IEP] for each disabled child, which must be designed by a "representative of the local educational agency," 20 U.S.C. § 1401(a)(20), and must be established, revised, and reviewed by the agency, 20 U.S.C. § 1414(a)(5). An IEP is prepared at a meeting between the qualified representative, the child's teacher, the child's parents or guardian, and, where appropriate, the child. 20 U.S.C. § 1401(a)(19). The IEP must contain statements concerning the child's level of functioning, goals, services to be provided, and objective criteria for evaluation pursuant to 20 U.S.C. § 1401(19).

In addition to the requirements for the IEP, IDEA sets forth extensive procedural requirements that states receiving federal funds under its provisions must follow. Of particular note are the Act's requirements that parents or guardians of a disabled child be notified of any proposed change in the child's IEP and that the parents be permitted to bring a complaint about any matter relating to the child's evaluation and education. 20 U.S.C. §§ 1415(b)(1)(D) and (E). Complaints brought by parents or guardians are entitled to an impartial due process hearing, 20 U.S.C. § 1415(b)(2), and a procedure for appeal to the state educational agency must be provided, 20 U.S.C. § 1415(c). Any party aggrieved by the findings and decision of the state administrative hearing may bring a civil action in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. 20 U.S.C. § 1415(e)(2).

IDEA provides that a court in which a civil action is filed "shall receive the record of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). In the present case, the parties have agreed to proceed solely on the record established in this case, and that record has been submitted and reviewed by the court.

The Supreme Court has noted that the "preponderance of the evidence" stan-

dard in section 1415(e)(2) is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). Moreover, the district court must give "due weight" to the state administrative proceedings. *Id.* The court must at least consider the ALJ's findings, but it is free to accept or reject the findings in whole or in part. *B.G. by F.G. v. Cranford Bd. of Educ.*, 702 F.Supp. 1140, 1149 (D.N.J.1988) (citing *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 791–92 (1st Cir.1984)), *aff'd*, 882 F.2d 510 (3rd Cir.1989). The Court of Appeals for the Tenth Circuit has held that the burden of proof "rests with the party attacking the child's individual education plan." *Johnson v. Independent School District No. 4 of Bixby*, 921 F.2d 1022, 1026 (10th Cir.1990) (citing *Alamo Heights Independent School District v. State Board of Educ.*, 790 F.2d 1153 (5th Cir.1986)), *cert. denied*, 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 79 (1991).

A district court's inquiry in an IDEA case is twofold: First, the court must ask if the state complied with the procedures set forth in IDEA. Second, the court must determine if the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits. *Id.*, 458 U.S. at 206–07, 102 S.Ct. at 3050–51. Because no issue has been raised questioning the defendants' compliance with the procedures of IDEA, we concern ourselves only with the second prong of inquiry: whether the IEP developed by the defendant school district was reasonably calculated to enable Michael Hall to receive an educational benefit. If the court were to conclude that the IEP was not so calculated, the court would then go on to consider whether the Halls' unilateral placement of Michael in the Gillis Center residential facility was the appropriate placement for him.

## II. Facts of the Case

The court has thoroughly reviewed the parties' briefs and the voluminous administrative record provided to the court. The facts relevant to this court's decision are summarized here.

Michael Hall was born on September 21, 1980, in Overland Park, Kansas. Michael has been diagnosed with disabilities known as Pervasive Developmental Disorder and Attention Deficit Hyperactivity Disorder. Pervasive Developmental Disorder is the more severe disability, and a child diagnosed with Pervasive Developmental Disorder tends to display some combination of the following characteristics: abnormalities in development of cognitive skills; abnormalities of posture and motor behavior; odd responses to sensory input such as ignoring some sensations, displaying oversensitivity to certain sensations and being fascinated by some sensations; abnormalities in eating, drinking, and sleeping; mood abnormalities; and, self-injurious behavior. Evaluations of Michael show that he has displayed these characteristics at times during his life.

From 1980 until 1986, Michael lived in Overland Park with his family. In 1986, the Halls moved to Asheboro, North Carolina, where Michael was enrolled in elementary school at the Donna Lee Loflin School. During his kindergarten year at Donna Lee Loflin, Michael received a special education assessment, and special education and related services. His teacher reported that he had physical difficulties and behavioral problems which included making inappropriate noises and disrupting the classroom. He also engaged in self-destructive behaviors at school. Early on, Michael was diagnosed as having mild cerebral palsy, although such a diagnosis has since been discounted.

In 1988, the Halls moved back to Overland Park, Kansas, and into the Shawnee Mission School District. Michael entered the district in September, 1988, when he was placed in the second grade at John Diemer Elementary School. At the time of his enrollment, Richard Hall requested that special education and related services be provided to Michael. He provided the district with several evaluations of Michael from North Carolina. Mr. Hall also contacted Sue Smart, the district psychologist, to request special individualized education services. Michael

was evaluated by the district in September, 1988, and an IEP was prepared within two weeks after his initial enrollment.

Michael's initial enrollment during the 1988–89 school year at John Diemer was in a mainstream second grade class, which was accompanied by two one-hour per week sessions of occupational therapy. Michael had ongoing problems at home and at school during his second grade year. Richard Hall noted a variety of behavioral problems with Michael at home, and T.L. Carswell, Michael's second grade teacher, reported that there were many times when Michael disrupted the class or would not cooperate.

During the school year, Mr. and Mrs. Hall had Michael evaluated at the Children's Rehabilitation Unit at the University of Kansas Medical Center at their own expense. Michael's evaluation by a team of specialists continued throughout the summer and was still ongoing at the time Michael entered third grade at John Diemer. The report prepared after the evaluation indicated that Michael could not work at an independent level in a mainstream classroom for longer than five minutes at a time unless certain behavioral components were addressed, and the report highlighted Michael's attention problems, impulsivity, destructibility, and hyperactivity. After receiving this evaluation, the Halls informed the Shawnee Mission School District of the evaluation. It is unclear from the record whether the actual report was provided to the district by the parents.

During his third grade year, the 1989–90 school year, Michael had continuing problems in the classroom. Dixie Laugesen, his teacher, testified during the due process hearing on this case that he had an extremely difficult time functioning in a self-contained third grade classroom from both a physical and educational standpoint. She noted that he had difficulty learning and often needed one-to-one instruction. He also exhibited inappropriate and distracting classroom behaviors. She asked for extra help in teaching Michael during the October and November months of 1989, and Michael began meeting two times per week with a special health teacher.

In January, 1990, Michael left Ms. Laugesen's classroom when the Halls placed him in the Crittenton Center in Kansas City, Missouri, for a 30–day residential evaluation based upon a recommendation of the University of Kansas Medical Center Children's Rehabilitation Unit evaluation. The Halls arranged for psychiatrist Judith Pfeffer to examine Michael and diagnose his problems. She diagnosed Michael's Pervasive Developmental Disorder and Attention Deficit Hyperactivity Disorder, and indicated that he was a strong candidate for continued residential treatment due to his need for a fully structured educational and home environment. She also opined that he absolutely required a highly structured, closed, small classroom and concluded that he would not be able to function if he were mainstreamed.

Psychologist Franklin Boraks also performed tests on Michael while he was at the Crittenton Center. He indicated that a highly structured placement which could deal with Michael's PDD would be necessary and appropriate.

Subsequent to his release from Crittenton, Michael was placed back into the mainstream third grade classroom at John Diemer with some special services provided outside the classroom. During that time he continued to see Dr. Pfeffer two to three times per week. She noted deterioration in his PDD. After approximately four weeks, Michael was removed from John Diemer and placed in the Crisis Intervention Diagnostic Classroom at the Corinth School in the Shawnee Mission School District for a six week trial period. This change in placement was the result of a March 1, 1990, IEP meeting concerning Michael, and the change in placement was agreed to by the Halls. Richard Hall testified at the due process hearing that the other options presented to him at that meeting were not acceptable and that residential placement for Michael was not considered by the district. Michael remained at Corinth for the remainder of the school year.

In April, 1990, a team of psychologists and psychiatrists from the KU Medical Center evaluated Michael Hall's records at the request of the Shawnee Mission School District

concerning the district's ability to serve him educationally. One of the doctors involved in this evaluation also had evaluated Michael when he was placed at the Medical Center by his parents for evaluation. The team concluded that the district was serving Michael's academic needs, and that it was the team's understanding that Michael was making good academic progress and exhibited few behavior problems. Michael's teacher [apparently in the self-contained behavior disorders classroom] reported that he was progressing to the point that he would soon be able to leave her class. The KU team did not address the issue of residential placement.

On April 18, 1990, another IEP meeting was held regarding Michael's education. Richard Hall was unhappy with the meeting and left, stating that Michael needed hospitalization. Subsequent to the aborted April IEP meeting the Halls requested a due process hearing concerning Michael's education. Thereafter, in May, 1990, Richard Hall prepared and submitted a proposed IEP to the district. In the IEP, he acknowledged that Michael had had some success and recommended a small, self-contained class for sixty to eighty percent of Michael's day. Also during May, 1990, a conference was held wherein the Halls and the school district agreed that there would be an additional attempt to prepare an IEP for Michael prior to any due process hearing, and that if an IEP acceptable to both parties could not be written, a formal due process hearing would be conducted. Soon thereafter, the district prepared a new IEP for Michael which apparently met with Richard Hall's approval. The due process hearing was not held and the Halls' request was apparently withdrawn.

On August 23, 1990, prior to the beginning of the 1990 school year, another IEP meeting was held concerning Michael. As a result of this meeting, Michael was again placed at the Corinth School to begin the 1990–91 school year. The long-term goal stated in the IEP prepared for Michael at that time was to gradually work him back into a mainstream classroom. The IEP also included a number of specific short-term goals for Michael's academic and social skills improvement. Mr. Hall testified at the due process hearing that

at the August meeting he requested residential placement for Michael, but that the district did not give it serious consideration. He testified that he requested the residential placement based on Michael's continuing inappropriate behavior at home and at school.

Michael began the 1990–91 school year attending an intermediate level classroom for students with behavior disorders at Corinth School. He was mainstreamed in a regular fourth-grade classroom for mathematics, spelling, social studies, language arts, and all "special" classes. During the fall of 1990, Michael's teachers at the Corinth School reported that Michael was making progress in school and behaved well. By December, 1990, Michael was attending mainstream classes for the majority of each day. Larry Campbell, the principal at Corinth School, testified at the due process hearing in this case that in the fall of 1990 Michael was a model student in the behavior disorders classroom, his peer relationships had improved, and he was accepted in the mainstream classrooms. Jennifer Fitzgerald, Michael's teacher in the behavior disorders classroom at Corinth in the fall of 1990, testified that Michael was performing approximately on grade level in all areas, that he performed well in her classroom and in the mainstream classes he attended. Other than some problems with organization, Ms. Fitzgerald testified that he was doing very well academically, and was doing A and B work.

However, during this time period, Michael's behavior problems at home persisted. The Halls sought assistance from the Kansas Department of Social and Rehabilitative Services [SRS] and a "child in need of care" petition was filed by SRS. The petition was granted and preparations were made to place Michael in a residential facility. The Halls received help and counseling in their home from SRS while awaiting Michael's placement. Testimony from the due process hearing in this case indicates that Kathy McCoy, a behavior specialist with the Shawnee Mission School District, worked with the Halls on behavior management strategies at home, although she also testified that she felt she was not successful in working with the Halls

due to their feelings that a home behavior management system would be unsuccessful.

Michael continued with his Corinth School placement until December 17, 1990, when his parents removed him from the school and placed him in the Gillis Center in Kansas City, Missouri. The Gillis Center is a residential educational program where the students live at the center full-time and attend school on the grounds of the facility. Upon entering the Gillis Center, evaluations were performed and it was noted that academically, Michael was performing approximately at his grade level.

The Halls sought a due process hearing in the fall of 1991 concerning the appropriateness of Michael's placement in the Shawnee Mission District and sought reimbursement for the expense of Michael's Gillis Center placement. The Halls presented the testimony of Richard Hall and psychiatrist Dr. Judith Pfeffer, who testified about Michael's need for the structure of a residential setting. The Halls also presented the testimony of teacher Sally Swindler and therapist Marlys Casteel, both of the Gillis Center, concerning Michael's treatment at Gillis and his behavior there. Dixie Laugeson, Michael's third grade teacher at John Diemer Elementary School, also testified concerning Michael's difficulties in her classroom.

At the hearing the district presented the testimony of Eleanora Sue Smart, school psychologist, Carleen Seaborn, behavior disorders teacher, Cindy Fisher, a learning center teacher who tested Michael Hall, Ruth Jackson, a learning specialist at Corinth School, Ruth Holzschuh, special education coordinator for the district, Kathy McCoy, behavior specialist with the district, Larry Campbell, principal of Corinth School, Fowler Jones, psychologist and associate professor of psychiatry at the University of Kansas Medical Center, Cynthia Scott, Michael's behavior disorders classroom teacher at Corinth in the spring semester of 1990 at Corinth School, Carol Huddleston, Michael's spelling teaching in the spring of 1990 at Corinth, Laurie Michie, the school social worker at Corinth, Jenny Fitzgerald, Michael's behavior disorders classroom teacher

in the fall semester of 1990 at Corinth, and Mary Conlan, director of special education for the district. Additionally, the parties presented numerous exhibits which are part of the record before this court.

In March, 1992, hearing officer Paul McKnab, Ed.D., a professor of special education at Emporia State University, concluded that the evidence presented at the due process hearing supported the district's position that Michael Hall was provided with an individual education and that he benefitted from it. The hearing officer did conclude that the school district was obligated to reimburse the Hall's for the cost of Michael's 1989 evaluation by the KU Medical Center team.[1] In August, 1992, reviewing officer Alan Alderson, a Topeka attorney, affirmed the decision of the hearing officer. The Halls then filed this lawsuit under the IDEA.

### III. The Educational Benefit Provided by Shawnee Mission School District to Michael Hall

■ In making a determination concerning the Shawnee Mission School District's obligation to pay for Michael Hall's residential placement at the Gillis Center, the court must make the following inquiries: First, the court must ask whether the district's IEP was reasonably calculated to confer an educational benefit on Michael. *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051. If the court determines that the IEP was not so calculated, the court must then ask whether the Hall's unilateral choice to place Michael in the Gillis Center's residential setting is the appropriate educational choice for Michael. If the answer to this second inquiry is "yes," then the Halls would be entitled to reimbursement from the district for the costs of Michael's placement at the Gillis Center. *See Burlington School Committee v. Department of Educ.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985).

The parties agree that from the time Michael entered the Shawnee Mission School District until he was placed in the Gillis Center, the district prepared numerous IEPs for Michael. The court considers only the

1. This issue is not before the court.

August, 1990, IEP and the attendant placement at Corinth School relevant to its decision concerning the educational benefit provided to Michael Hall. There were no unresolved parental objections to prior IEPs prepared by the district. The court must decide whether this 1990 IEP was reasonably calculated to confer some educational benefit on Michael.

■ An IEP which is reasonably calculated to confer some educational benefit on a disabled child must offer more than a trivial or de minimis educational benefit, *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1213 (3d Cir. 1993), and it must be "likely to produce progress, not regression or trivial educational advancement," *Board of Educ. v. Diamond,* 808 F.2d 987, 991 (3rd Cir.1986) (citing *Hall v. Vance County Board of Educ.*, 774 F.2d 629, 636 (4th Cir.1985)). However, a free, appropriate education does not require the states to "maximize the potential of handicapped children 'commensurate with the opportunity provided to other children.'" *Rowley*, 458 U.S. 176, 189–90, 102 S.Ct. 3034, 3042–43 (1982) (quoting *Rowley v. Board of Educ. of Hendrick Hudson Central School Dist.*, 483 F.Supp. 528, 534 (S.D.N.Y.1980)).

■ A parallel goal of IDEA is that disabled children be educated in classrooms with nonhandicapped children "to the maximum extent appropriate." 20 U.S.C. § 1412(5). IDEA's so-called "mainstreaming" requirement has been construed to "prohibit a school from placing a child with disabilities outside of a regular classroom if educating the child in the regular classroom with supplementary aids and support services can be achieved satisfactorily." *Oberti*, 995 F.2d at 1207. IDEA requires states to "educate handicapped children with nonhandicapped children whenever possible." *Rowley*, 458 U.S. at 202, 102 S.Ct. at 3049. It was the school district's obligation to balance the goal of providing Michael Hall with some educational benefit with the goal of providing that benefit in the least restrictive environment.

■ At the time Michael Hall was removed from the Shawnee Mission School District, Michael's IEP called for him to be placed in a self-contained behavior disorders classroom at the Corinth School, and to be mainstreamed between zero and one hundred percent of his day. By December, 1990, he was being mainstreamed for upwards of seventy percent of his day. The record reveals that Michael's teachers reported and testified that his progress during the fall semester of 1990 was very good. The court finds this testimony credible. Michael was being gradually mainstreamed for larger percentages of his day, and according to Jenny Fitzgerald, he was a model student in the behavior disorders classroom. Based upon the clear evidence in the record, the court finds that his academic achievement was on par with his grade level. His behavior problems at school were very minor during this semester.

On the other hand, Michael's behavior problems at home during 1990 were reported by his parents as quite severe. Dr. Judith Pfeffer testified at the due process hearing in this case that in the fall of 1990 she felt that things had deteriorated so badly that residential placement was necessary. She testified that he was not manageable at home. Dr. Pfeffer was unable to testify as to his school functioning at that time, although she did state that she "thought" it was poor. The court finds Dr. Pfeffer's testimony credible as to Michael's home behavior, but notes that her opinion concerning the necessity of residential placement was not based upon Michael's school performance.

Based upon the court's review of the record and the court's consideration of the administrative decisions in this case, together with the briefs submitted by the parties, the court finds that Michael was achieving an educational benefit from his placement in the fall of 1990. He was performing approximately on grade level in all subjects. He was performing above grade level in reading. His classroom behavior was described as "good" and "improving" during that time period, and the court sees no reason to discount the testimony of his teachers describing his behavior and his academic achievement. The parents have presented no evidence from which the court could conclude that a residential placement was necessary from a purely academic standpoint. Thus, based on

the evidence concerning Michael's school performance, it appears that the district complied with the requirements of IDEA. As described by the Supreme Court in *Rowley*, a special education "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." 458 U.S. at 202, 102 S.Ct. at 3049.

In the plaintiffs' brief, however, they contend that the school district was not providing a free, appropriate education for Michael at the time he was placed in the Gillis Center because the district had not adequately evaluated and assessed Michael's progress to determine whether he was receiving an educational benefit, but instead had simply relied on the fact that Michael was advancing from grade to grade. The Halls contend that the school district focused on Michael's academic progress exclusively, and ignored his social and emotional needs.[2] The Halls further argue that the district's reliance on Michael's grade-to-grade advancement was misplaced, and the district needed to consider Michael's "whole" self in creating his IEPs and attendant placements. The Halls argue that Michael's developmental disorder and attention deficit syndrome require a completely structured environment which can only be provided in a residential setting and that such a placement should have been considered. The Halls point to several cases decided by courts in other jurisdictions wherein residential placement was deemed necessary in order to benefit severely handicapped children. *See Abrahamson v. Hershman*, 701 F.2d 223, 228 (1st Cir.1983); *Kruelle v. New Castle County School Dist.*, 642 F.2d 687, 693 (3rd Cir.1981); *B.G. by F.G. v. Cranford Bd. of Educ.*, 702 F.Supp. 1140 (D.N.J.1988); *Angevine v. Jenkins*, 752 F.Supp. 24 (D.D.C. 1990); *Christopher B. v. Longview School Dist.*, 18 IDELR 514 (1992).

The court has reviewed the "residential placement" cases cited by the plaintiffs and concludes that they are distinguishable from the present case. In *Angevine*, the student was making little or no progress in the public school setting. Similarly, in the *Christopher B.* case relied upon by plaintiffs, the student had stopped making academic progress and was actually regressing under the school district's IEP. Here, Michael was making progress at school, but was having serious problems at home.

The *B.G.* case cited by plaintiff is more analogous to the present case in that B.G.'s behavior problems at home were more severe than his problems at school. However, the *B.G.* case was decided under a different standard than that at issue in the present case. Although *B.G.* was brought under the predecessor statute to the IDEA, it was decided under that standard of what was the *best* educational environment for the student, as opposed to the "some educational benefit" standard at issue here. *See* 702 F.Supp. at 1148. That best education environment standard was applied in *B.G.* because the state of New Jersey has chosen to exceed the standards mandated by federal law for the education of handicapped children. *Id.* The *B.G.* court wrote: "The mere fact that B.G. obtained passing grades (barely) and was promoted to the next grade level at [the public school], though perhaps sufficient to satisfy the minimum federal standards under *Rowley*, is insufficient and inconsistent with New Jersey's requirements that B.G. be afforded a program that assures him the fullest opportunity to develop his intellectual capacities." *Id.* at 1157 (citation omitted).

The other cases cited by plaintiffs, as well as cases located by the court where residential placement has been deemed to be the appropriate educational setting for a child, are also distinguishable from the present case. In *Chris D. v. Montgomery County Bd. of Educ.*, 743 F.Supp. 1524 (M.D.Ala. 1990), the court ordered residential placement for a student whose behavioral problems at school were so bad that the school district's only alternatives included homebound schooling or schooling in an isolated

---

**2.** Plaintiffs also argue that the district erred in failing to have Michael evaluated by a psychiatrist. The court is aware of no case law or specific statutory requirement in IDEA that school districts use psychiatrists to evaluate students. Here, a psychologist and numerous other professionals evaluated and assessed Michael Hall. In light of the court's conclusion that the district was providing Michael with a free, appropriate education, the court does not reach this precise issue.

classroom with no other students present. In the *Kruelle* case cited by plaintiffs, the student was severely mentally retarded, had cerebral palsy, and had the social skills of a six-month-old infant. 642 F.2d at 688–89. The child vomited and choked regularly and was thus unable to function or be educated outside of a 24–hour residential care facility. The *Kruelle* court held that because the child lacked the most elementary social skills and because his medical problems interfered with his ability to learn, his education necessarily encompassed those skills and medical care. *Id.* at 694.

The students in the above-listed residential placement cases are plainly different from Michael Hall, whose academic and social functioning were improving in the school setting, but whose behavioral problems in the home setting were severe. The court find the case of *Swift v. Rapides Parish Public School Sys.*, 812 F.Supp. 666 (W.D.La.), *aff'd*, 12 F.3d 209 (5th Cir.1993), much more closely analogous to the present case than any of the cases relied upon by plaintiff. In *Swift*, the district court found that although an emotionally and behaviorally disturbed child might perform better in a residential setting, he was receiving a benefit from his public school placement sufficient to comply with the requirements of IDEA. *Id.* at 673.

The facts of the *Swift* case are quite similar to those presented here and a review of those facts may be helpful here. David Swift suffered from attention deficit syndrome, and was classified as Behavior Disordered/Emotionally Disturbed. *Id.* at 668. Although several placements for David were tried by the school district, David's parents repeatedly objected to the district's placements. After seeking several private evaluations for David, the Swifts requested residential placement. *Id.* at 669–70. At least one expert contacted by the Swifts recommended residential placement due to the difficulties David's parents were having handling him at home. On the other hand, the picture of David presented by his teachers and the school board's experts portrayed him as progressing academically, engaging in no violent behavior at school, and functioning on par with his grade level academically. Like Michael Hall, David was unilaterally removed from his public school placement by his parents.

The *Swift* court concluded that the Swifts had failed to meet their burden to show that the educational program provided by the school district did not afford him any meaningful benefit. *Id.* at 672. The court did not doubt that David might benefit from a residential facility, but concluded that such a placement was not mandated by IDEA. *Id.* at 673. Rather, the court was convinced that his placement in the school district—which consisted of a self-contained behavior disorders classroom with a teacher's aide, computers, a certified special education teacher, and mainstreaming for physical education, recess and lunch—conferred upon him some meaningful educational benefit. *Id.* The court went on to hold that while it was sympathetic to the Swifts' problems controlling David in the home environment, "it is not the legal responsibility of the School Board to remedy problems with David in the home." *Id.*

Like the court in *Swift*, this court concludes that residential placement would not be legally required by IDEA to remedy Michael's problems in the Halls' home. Counseling and instruction to parents regarding the implementation of any school-based training may be a "related service" as described in IDEA. 34 C.F.R. 300.13(a). However, the school district did provide the Halls with some help through Kathy McCoy. There is no evidence in the record upon which the court could find that residential placement was warranted based upon his fall 1990 school performance. The Halls have not met their burden to show that the district failed to offer Michael a free, appropriate education or that his August, 1990, IEP was not reasonably calculated to enable him to receive some educational benefit.

The court therefore concludes that in light of *Rowley's* guidance, the *Swift* decision, and particularly in light of the IDEA's complementary goal that disabled students be educated in the least restrictive environment possible, Michael Hall's August, 1990, IEP was reasonably calculated to provide him with some educational benefit. His success in the Corinth School environment is evi-

dence of the IEP's appropriateness. While in Michael's parents' eyes a residential setting may be the best possible environment to address Michael's behavioral problems, it is the court's conclusion that such a placement is not mandated by IDEA, and in fact may have been more restrictive than the district could legally choose in light of IDEA's mainstreaming goal. Had the district considered residential placement for a child who was by all accounts performing well at school and who was being mainstreamed for increasing percentages of his school day without incident, the district might have run afoul of IDEA's "least restrictive environment" mandate.[3]

IT IS, THEREFORE, BY THE COURT ORDERED that judgment is rendered in favor of the defendants on all claims in this matter, and all plaintiffs' claims against the defendants are hereby dismissed.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**

---

**3.** Because the court has concluded that the individualized education program provided for Michael by the defendant district in the fall of 1990 was appropriate and was designed to enable him to receive some educational benefit, the court does not reach the issue of whether the Halls' placement of Michael at the Gillis Center residential facility was appropriate.